167 F.3d 873
 9 A.D. Cases 15, 14 NDLR P 193
 Luciano MONTALVO, individually and as the parent and
guardian of Michael Montalvo, Plaintiff-Appellant,
v.
James P. RADCLIFFE, II; Southside Virginia Police Karate
Association, Incorporated, d/b/a U.S.A.
Bushidokan, Defendants-Appellees,
and
Donna Radcliffe, Defendant.
 No. 98-1169.
 United States Court of Appeals,
Fourth Circuit.
 Argued Oct. 26, 1998.
Decided Feb. 12, 1999.
 
 ARGUED: Terry William Raney, Richmond, Virginia, for Appellant. Nathaniel Macon Collier, III, Colonial Heights, Virginia, for Appellees. ON BRIEF: John W. Whitehead, Stephen H. Aden, The Rutherford Institute, Charlottesville, Virginia, for Appellant.
 Before WILKINS and NIEMEYER, Circuit Judges, and BLAKE, United States District Judge for the District of Maryland, sitting by designation.
 Affirmed by published opinion. Judge NIEMEYER wrote the opinion, in which Judge WOLKINS and Judge BLAKE joined.
 OPINION
 NIEMEYER, Circuit Judge:
 
 
 1
 Michael Montalvo, a 12-year old boy with AIDS, was denied admission to a traditional Japanese style martial arts school because of his HIV-positive status. In this action, brought under Title III of the Americans with Disabilities Act (prohibiting discrimination on the basis of disability by places of public accommodation), the district court denied Montalvo relief because his condition posed a significant risk to the health or safety of other students and no reasonable modification could sufficiently reduce this risk without fundamentally altering the nature of the program. We affirm.
 
 
 2
 * Southside Virginia Police Karate Association, Inc. operates a karate school in Colonial Heights, Virginia, known as U.S.A. Bushidokan, which is owned by James P. Radcliffe, II. The school teaches exclusively traditional Japanese, combat-oriented martial arts rather than the more prevalent, family-oriented fitness programs offered by most martial arts schools. Within the first three weeks of lessons at U.S.A. Bushidokan, students learn techniques that involve substantial body contact, and within the first few months they apply these techniques to spar in actual combat situations. Radcliffe testified at trial that the sparring often results in injuries which, while minor, are bloody:
 
 
 3
 In the course of their sparring or their fighting a blow can take place that may initiate some type of open wound or may initiate blood flow. The continuation of their activity, it continues for as long as they continue to show defensive techniques and then at some point, maybe seconds, maybe even closer up to a minute, they will break and at that point that's normally the point where we'll notice that someone has blood on them.
 
 
 4
 When we spar one person off another, at the finish of that whole thing, 10 to 15 minutes, we'll have blood all over our uniforms and hands and have no idea where it came from, who it came from or things of that nature.
 
 
 5
 He explained that to progress "through the belt," a level of achievement, a student must "engage in combat activity fighting. You have to do the self-defense. It involves contact, that's what we do." Radcliffe noted that inherent in this form of karate are "consistently scratched skin, scratches, gouges, bloody lips, bloody noses, things of that nature."
 
 
 6
 In May 1997, Luciano and Judith Montalvo applied to enter their 12-year old son, Michael, into group karate classes at U.S.A. Bushidokan because Michael wanted to learn karate with some friends who had already begun lessons there. Luciano Montalvo signed a "Membership Application and Agreement" form in which he warranted that Michael was "in good health and that [he] suffer[ed] from no illness or condition ... which would possibly be infectious to others" and that the Montalvos understood that "no member [would] use the facilities with any open cuts, abrasions, open sores, infections, [or] maladies with the potential of harm to others." In fact, however, Michael had AIDS. The Montalvos did not disclose that fact to U.S.A. Bushidokan because they were afraid that U.S.A. Bushidokan would not enroll Michael if it knew of his HIV-positive status.
 
 
 7
 Later, on the same day that the Montalvos submitted Michael's application, Radcliffe, having received information from an anonymous source, telephoned the Montalvos to inquire whether Michael had AIDS. Luciano Montalvo demanded to know the source of the information and adamantly and repeatedly denied that Michael had AIDS or was HIV-positive. After the Montalvos gave U.S.A. Bushidokan an affidavit from Michael's treating physician, Dr. Suzanne R. Lavoie, stating her medical opinion that Michael was "fit to begin karate classes," Michael began participating in karate classes at U.S.A. Bushidokan. After the first class, however, Radcliffe telephoned Luciano Montalvo to tell him that Dr. Lavoie's letter "wasn't sufficient" and to request that Michael have an AIDS test. This request prompted Luciano Montalvo to admit finally that Michael had AIDS.
 
 
 8
 Radcliffe then met with the Montalvos and informed them that Michael would not be allowed to participate in group karate classes at U.S.A. Bushidokan because of the risk of transmitting HIV to other students through frequent bloody injuries and physical contact. Radcliffe, however, did offer to give Michael private karate lessons. Luciano Montalvo immediately rejected that proposal because "the whole reason" he signed Michael up for lessons was that Michael "wanted to be with his friends."
 
 
 9
 On behalf of Michael, Luciano Montalvo filed this action against U.S.A. Bushidokan and Radcliffe under the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq., and the Virginia Persons with Disabilities Act, Va.Code § 51.5-44B, requesting an injunction requiring the defendants to give Michael access to and the benefit of the group martial arts classes and to refrain from discriminating against Michael in any manner because he had AIDS. The Montalvos also sought damages and the costs of litigation.
 
 
 10
 Following a bench trial, the district court ruled in favor of U.S.A. Bushidokan,[1] concluding that:
 
 
 11
 Placing plaintiff directly into the martial arts classes at U.S.A. Bushidokan would present a direct threat to the health and safety of the instruction personnel and the students in violation of 42 U.S.C. § 12182 [ (b) ](3). Forcing U.S.A. Bushidokan to alter the format of its instruction towards a "softer," less-rigorous style would be equally hazardous; it would eliminate the function of the training at U.S.A. Bushidokan and comprise an unreasonable modification in violation of 42 U.S.C. § 12182(b)(2) and well-established case law. Finally, in light of the rigor and intensity of training at U.S.A. Bushidokan, defendant's offer to provide plaintiff with private lessons in lieu of class instruction is a "reasonable" accommodation under § 12182(b)(2).
 
 
 12
 The court rejected the state law claims for the same reasons it rejected the claims under the Americans with Disabilities Act.
 
 
 13
 In making its ruling, the district court found as facts, inter alia, that U.S.A. Bushidokan taught "hard-style Japanese karate ... with a heavy emphasis on sparring and actual-fight simulation"; that there was "a high frequency of minor but bloody abrasions among the students"; and that the blood from such injuries was "extremely likely" to spill onto the students' hands, uniform, mouth, or "even onto the students with whom he or she is training." The court found that it was"impossible" for U.S.A. Bushidokan to detect and attend to each injury immediately despite "conscientious and effective treatment procedures." The court acknowledged the existence of "universal precautions"--established procedures for handling blood safely--but found that even "a strict adherence" to such precautions would not prevent the spillage of blood and other bodily fluids and the attendant risk of HIV transmission. Based on the expert testimony offered by both sides, the court found that HIV can be transmitted by "introducing the blood of one person who is HIV-positive into a wound of another person," or even "when contaminated blood is splashed into the eyes or onto the skin, even in the absence of an open wound." The court found that the transmission risk if Michael were to participate in group classes at U.S.A. Bushidokan would be "significant."
 
 
 14
 From the district court's judgment in favor of U.S.A. Bushidokan and Radcliffe, the Montalvos filed this appeal. On appeal, they argue that they established their case for discrimination under the Americans with Disabilities Act based on Michael's exclusion from karate classes because of his having AIDS and that the district court clearly erred in finding (1) that "Michael's condition posed a 'direct threat' to the health and safety of other class members" and (2) that "U.S.A. Bushidokan's offer of private lessons to Michael was a reasonable accommodation [for] Michael's disability."[2]
 
 II
 
 15
 Title III of the Americans with Disabilities Act ("ADA") was enacted to facilitate disabled individuals' access to places of public accommodation. Consistent with this goal, the Act states broadly:
 
 
 16
 No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.
 
 
 17
 42 U.S.C. § 12182(a). The ADA defines "denial of participation" in a program offered by a place of public accommodation to be an act of discrimination. 42 U.S.C. § 12182(b)(1)(A)(i).
 
 
 18
 Recognizing that the need to protect public health may at times outweigh the rights of disabled individuals, Congress created a narrow exception to this broad prohibition against discrimination based on disability in places of public accommodation. Thus, a place of public accommodation is entitled to exclude a disabled individual from participating in its program "where such individual poses a direct threat to the health or safety of others." 42 U.S.C. § 12182(b)(3) (emphasis added). The Act defines "direct threat" as "a significant risk to the health or safety of others that cannot be eliminated by a modification of policies, practices, or procedures or by the provision of auxiliary aids or services." Id.
 
 
 19
 When determining whether an individual poses a "direct threat," a place of public accommodation must not base its calculus on stereotypes or generalizations about the effects of a disability but rather must make "an individualized assessment, based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence." 28 C.F.R. § 36.208(c). The relevant factors which the place of public accommodation must weigh and balance are "the nature, duration, and severity of the risk [and] the probability that the potential injury will actually occur." Id.; see also 28 C.F.R. Pt. 36, App. B, p. 598 (1998) (noting that the direct threat provision in Title III of the ADA codifies School Bd. of Nassau County v. Arline, 480 U.S. 273, 287-88, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987) (delineating criteria for determining whether, under § 504 of the Rehabilitation Act, a tubercular teacher posed a significant risk to the school community)).
 
 
 20
 If the place of public accommodation determines that the individual would pose a significant risk to the health and safety of others, it must then ascertain "whether reasonable modifications of policies, practices, or procedures will mitigate the risk," 28 C.F.R. § 36.208(c), to the point of "eliminat[ing]" it as a "significant risk," 42 U.S.C.s 12182(b)(3). See also Bragdon v. Abbott, 524 U.S. 624, ----, 118 S.Ct. 2196, 2210, 141 L.Ed.2d 540 (1998) (explaining that "[b]ecause few, if any, activities in life are risk free, Arline and the ADA do not ask whether a risk exists, but whether it is significant"). Under the ADA, a failure to make a reasonable modification is itself an act of discrimination unless the place of public accommodation can demonstrate that implementing the modification would fundamentally alter the nature of the program. See 42 U.S.C. § 12182(b)(2)(A)(ii).
 
 
 21
 In this case, U.S.A. Bushidokan concedes that its karate school is a place of public accommodation subject to the requirements of Title III, see 42 U.S.C. § 12181(7)(L), and that Michael Montalvo is disabled for purposes of the ADA by virtue of being HIV-positive or having AIDS, see 42 U.S.C. § 12102(2)(A).[3] U.S.A. Bushidokan also concedes that it denied Michael participation in group karate classes on the basis of his HIV-positive status, the condition that concededly constitutes his disability. But U.S.A. Bushidokan contends that its exclusion of Michael was legally justified because Michael posed a "direct threat" to other members of the karate class. This contention presents two issues: (1) whether Michael's condition posed a significant risk to the health or safety of others and (2) whether reasonable modifications of policies, practices, or procedures were available to eliminate the risk as a significant one. See 42 U.S.C. § 12182(b)(3).
 
 
 22
 * While the question of whether Michael's HIV-positive status posed a significant risk to the health or safety of others is a "fact intensive determination," Rizzo v. Children's World Learning Centers, Inc., 84 F.3d 758, 764 (5th Cir.1996), the evidence in the record before us is ample to support the district court's conclusion that Michael posed such a risk.
 
 
 23
 First, both the Montalvos' and U.S.A. Bushidokan's medical experts testified that blood-to-blood contact is a means of HIV transmission, and both experts agreed that AIDS is inevitably fatal. In addition, U.S.A. Bushidokan's expert testified without challenge that it was possible to become infected with the virus from blood splashing into the eyes or onto seemingly intact skin.
 
 
 24
 Second, the type of activity offered at U.S.A. Bushidokan emphasized sparring, attack drills, and continuous body interaction with the result that the participants frequently sustained bloody injuries, such as nose bleeds, cuts inside the mouth, and external abrasions. Radcliffe testified that blood from those injuries is "extremely likely" to come in contact with other students' skin. Even though U.S.A. Bushidokan had a policy of constantly monitoring for bloody injuries and removing for treatment participants with those injuries, the fast-paced, continuous combat exercises hampered U.S.A. Bushidokan's efforts to eliminate contact when such injury occurred.
 
 
 25
 From these facts and other similar evidence, the district court found that there is "a high frequency of minor but bloody abrasions among the students" and that the blood from such injuries is "extremely likely" to spill onto the hands, uniforms, and mouths of other students. The court also found that because of this likelihood and because of the ineffectiveness of the "universal precautions" for handling blood in the context of this hard-style karate, the risk of a student's transmitting HIV to another student was "significant." We agree.
 
 
 26
 The nature, duration, and severity of the risk and probability of transmission--factors outlined by Arline and the ADA regulations--indicate that a significant risk to the health and safety of others would exist if Michael were allowed to participate in the group karate classes. Cf. Doe v. University of Maryland Medical Sys. Corp., 50 F.3d 1261 (4th Cir.1995) (holding that a hospital could terminate the residency of an HIV-positive surgical resident on the ground that the individual was not "otherwise qualified" for his position because he posed a significant risk to others). The nature of the risk, which Arline defines as the mode of transmission of the disease, see 480 U.S. at 288, 107 S.Ct. 1123, is blood-to-blood or blood-to-eye contact, according to the testimony of both sides' experts. The duration of the risk, which Arline defines as how long the carrier is infectious, see id., is for the length of Michael's life. The severity of the risk is extreme because there is no known cure for AIDS, and, as the Montalvos concede, AIDS is inevitably fatal. And although the exact mathematical probability of transmission is unknown, the mode of transmission is one which is likely to occur in U.S.A. Bushidokan's combat-oriented group karate classes because of the frequency of bloody injuries and body contact. Thus, the nature of the risk, combined with its severity, creates a significant risk to the health and safety of hard-style karate class members.
 
 
 27
 When balancing the Arline factors to determine whether a risk is significant, one need not conclude that each factor is significant on its own. Rather, the gravity of one factor might well compensate for the relative slightness of another. Thus, when the disease at risk of transmission is, like AIDS, severe and inevitably fatal, even a low probability of transmission could still create a significant risk. In this case, therefore, we agree with the district court that Michael's condition posed a significant risk to the health and safety of others.
 
 
 28
 The Montalvos challenge the district court's factual findings because they are supported by the testimony of Dr. Carey Bruce Savitch, the medical expert who testified on behalf of U.S.A. Bushidokan. They maintain that Dr. Savitch testified to conclusions that did not follow from scientific premises and that, therefore, his conclusions should be disregarded. We note, however, that Dr. Savitch's conclusions were not critical to the district court's factual findings since the Montalvos' expert reached essentially the same conclusions about the nature of transmitting HIV. But even if Dr. Savitch's testimony had been important to the district court's findings, the Montalvos' argument could not succeed because the Montalvos failed to object to Dr. Savitch's testimony during trial in the district court. See C.B. Fleet Co., Inc. v. SmithKline Beecham Consumer Healthcare, L.P., 131 F.3d 430, 437 (4th Cir.1997).
 
 
 29
 The Montalvos also argue that Dr. Savitch was merely a private physician and that his testimony should therefore be accorded less weight than that of public health authorities. It is true, as the Supreme Court recently observed, that in assessing the reasonableness of a place of public accommodation's decision to refuse service to an individual with a disability because of an alleged direct threat to the health or safety of others, the views of public health authorities, while not conclusive, "are of special weight and authority." Bragdon, 524 U.S. 624, 118 S.Ct. at 2211. But this argument does not advance the Montalvos' cause because their case was also not supported by any evidence from public health authorities. On appeal, they do cite a number of medical journals and public health publications for the first time in their brief, but we will not consider factual evidence that was not presented at trial.
 
 
 30
 Even if we were to consider the materials submitted by the Montalvos for the first time on appeal, they would not alter the outcome of this case. The bulk of the Montalvos' citations refer either to the fact that people who are HIV-positive face great personal and social challenges or to studies regarding the transmission of HIV between dentists and patients. The former fact, which is most unfortunately true, only reinforces the view that Michael's classmates should not be subjected to any significant risk of HIV transmission, and the studies of HIV transmission between dentists and patients are irrelevant to ascertaining the risk of transmission existing during hard-style karate sparring. The likelihood of exposure to blood is different for the two activities.
 
 
 31
 The experts in this case agreed that HIV can be transmitted through blood-to-blood contact, and the evidence showed that this type of contact occurred frequently in the karate classes at U.S.A. Bushidokan. Thus, the district court's finding that Michael Montalvo posed a significant risk to the health or safety of others is amply supported by the evidence.
 
 B
 
 32
 Even though Michael Montalvo's condition posed a significant risk to the health or safety of others, U.S.A. Bushidokan would still be required to admit him to group karate classes if a reasonable modification could have eliminated the risk as a significant one. See 42 U.S.C. § 12182(b)(3). The only modification which was both effective in reducing risk to an insignificant level and in maintaining the fundamental essence of U.S.A. Bushidokan's program was its offer of private karate classes to Michael.
 
 
 33
 In considering other modifications, U.S.A. Bushidokan was entitled to reject the modification that would soften the teaching style of its program. U.S.A. Bushidokan's unique niche in the martial arts market was its adherence to traditional, "hard-style" Japanese karate, and the contact between participants, which causes the bloody injuries and creates the risk of HIV transmission, was an integral aspect of such a program. To require U.S.A. Bushidokan to make its program a less combat-oriented, interactive, contact intensive version of karate would constitute a fundamental alteration of the nature of its program. The ADA does not require U.S.A. Bushidokan to abandon its essential mission and to offer a fundamentally different program of instruction. See 42 U.S.C. § 12182(b)(2)(A)(ii).
 
 
 34
 Similarly, U.S.A. Bushidokan was not required to implement further "universal precautions" such as using eye coverings and wearing gloves. The district court found as a fact that these modifications would not accomplish their goal of eliminating or reducing the otherwise significant risk Michael would pose to his classmates. As Radcliffe testified on behalf of U.S.A. Bushidokan, the suddenness of injuries, the tendency of some wounds to splatter blood, the continuing movement and contact, and the inability to detect injuries immediately all would undermine the effectiveness of these precautions, particularly for places not protected by eye coverings, gloves, or other similar coverings.
 
 
 35
 U.S.A. Bushidokan did propose the effective modification of giving Michael private karate lessons, and the district court found this modification reasonable. But the Montalvos rejected this proposal. While an ADA plaintiff is under no obligation to accept a proffered, otherwise reasonable modification, see 28 C.F.R. § 36.203(c)(1) ("Nothing in this part shall be construed to require an individual with a disability to accept an accommodation ... under this part that such individual chooses not to accept"), such rejection does not impose liability on U.S.A. Bushidokan for failure to modify its program.
 
 
 36
 Accordingly, we conclude that U.S.A. Bushidokan, in excluding Michael Montalvo from participating in its combat-oriented group karate classes, did not violate Title III of the ADA because Michael posed a significant risk to the health and safety of others that could not be eliminated by a reasonable modification. The judgment of the district court is AFFIRMED.
 
 
 
 [1]
 Because the karate school was owned and operated by U.S.A. Bushidokan and the Montalvos' contract was with the corporation, the district court dismissed Radcliffe as a defendant, a ruling that the Montalvos have not challenged on appeal
 
 
 [2]
 Title III of the Americans with Disabilities Act does not impose a requirement that a place of public accommodation provide a "reasonable accommodation" for a disability, but rather that, in limited circumstances, it make reasonable modifications. See 42 U.S.C. §§ 12182(b)(2)(A)(ii), 12182(b)(3)
 
 
 [3]
 Because U.S.A. Bushidokan does not contest Michael's claim that he is disabled as defined by the ADA, we need not address the issue further. Cf. Bragdon, 524 U.S. at ----, 118 S.Ct. at 2207, 141 L.Ed.2d 540 (holding that the plaintiff, who was HIV-positive, was disabled because the major life activity of procreation was substantially impaired, but declining to reach the question of whether HIV-positive status is per se a disability)