2004 ME 143

Jon SCOTT

v.

ANDROSCOGGIN COUNTY JAIL et al.

Supreme Judicial Court of Maine.

Submitted On Briefs: Sept. 9, 2004.

Decided: Nov. 29, 2004.

Jon Scott, Van Buren, for plaintiff.

Michael J. Schmidt, Esq., Wheeler & Arey, P.A., Waterville, for defendant.

Panel: SAUFLEY, C.J. and CLIFFORD, RUDMAN, DANA, ALEXANDER, CALKINS, and LEVY, JJ.

ALEXANDER, J.

[¶ 1] Jon Scott appeals from entry of a summary judgment by the Superior Court (Androscoggin County, *Gorman, J.*) in favor of defendants Androscoggin County and Androscoggin County Jail (the County). Scott had filed complaints pursuant to the Maine Human Rights Act, 5 M.R.S.A. §§ 4551–4634 (2002 & Supp.2003), and Title II of the Americans with Disabilities Act, 42 U.S.C.A. §§ 12131–12134 (1995 & Supp.2004), asserting that the County had refused to accommodate his medication schedule while he was incarcerated. Scott contends that the trial court applied an incorrect legal standard for recovery under the MHRA and ADA, and that genuine issues of material fact preclude entry of judgment as a matter of law.

[¶ 2] Although we clarify the correct legal standard for recovery under the ADA and the MHRA, we affirm the judgment because Scott failed to establish an actionable claim pursuant to those statutes.

## I. CASE HISTORY

[¶ 3] Scott has been diagnosed as suffering from several mental illnesses for which he takes medications. He was incarcerated at the Androscoggin County Jail on four occasions in October 1999, February 2000, July 2000, and September 2000. During that time, his treating physician had prescribed that Scott take two of his medications, Xanax and Inderal, five times per day. Scott asserts that he had maintained this medication schedule for a substantial period of time before 2000.

[¶ 4] According to regular practice at the Androscoggin County Jail, medications are distributed three times per day. In anticipation of Scott entering the jail in October 1999, Scott's physician changed his medication schedule to three times per day. The physician believed that any discomfort Scott might feel as a result of changing the dosage to three times per day, with the same amount of medication, would be tolerable.

[¶ 5] While incarcerated in October, Scott experienced some discomfort from the change in schedule. When he returned to the jail in February 2000, he requested that the jail accommodate his five times per day schedule.

[¶ 6] As a result of Scott's request, a physician's assistant employed by the jail's contractual medical provider conducted an investigation regarding Scott's medication. The physician's assistant performed medical research, consulted with two physicians, including Scott's treating physician, and two pharmacists, and concluded that the normal frequency for taking Xanax and Inderal was three times per day, and that it was not medically necessary for Scott to receive the medication five times per day. The medical provider decided that Scott would receive all of the medicine that was prescribed, but three times per day instead of five.

[¶ 7] During the February 2000 incarceration, Scott threatened to sue if he did not receive his medications five times per day. The jail administrator acquiesced in Scott's demands, despite the medical provider's recommendation.

[¶ 8] During Scott's incarcerations in July and September 2000, the time periods at issue in this case, the jail administrator declined to accede to Scott's demands, and Scott was provided his medications according to the three times per day schedule. The jail administrator determined that he should defer to the medical provider on issues involving medical judgment, and he did not wish to set a precedent resulting in other prisoners' demanding medications on schedules of their choosing.

[¶ 9] In July 2000, after being given his medications three times per day, Scott began to complain of symptoms resulting from the change in schedule. Again, he demanded medications five times per day. In response, the medical provider contacted Scott's treating physician. Scott's physician agreed that the jail could administer Scott's medication three times per day, on the condition that Scott be monitored closely. The medical provider assured the physician that jail personnel would monitor Scott every fifteen minutes for adverse reactions potentially caused by the medication schedule.

[¶ 10] Scott repeatedly complained of nausea, dizziness, shortness of breath, chest pains, and loss of appetite. He slept a lot and sometimes missed or refused meals or the recreation period. In response to Scott's complaints, the medical

provider examined Scott and determined that the three times per day schedule could be continued. In its statement of material facts, the County asserted, with appropriate record references, that several of the symptoms claimed by Scott did not occur and that some of Scott's claimed problems were inconsistent with regular physical observations of Scott by jail personnel. Scott did not adequately controvert these statements. *See* M.R. Civ. P. 56(h)(4).

[¶ 11] Before Scott returned to the jail in September 2000, his physician wrote a letter to the jail's medical provider stating that based on what Scott had reported to him, Scott should receive his medication five times per day. Based on jail logs that recorded physical observations of Scott that were inconsistent with the physical problems reported by Scott, the medical provider did not believe that Scott accurately reported his symptoms to his physician. The jail provided Scott his medications three times per day during the September incarceration.

[¶ 12] Scott filed a grievance with the jail administrator, alleging that the jail failed to make reasonable accommodations for his disability. The grievance was denied. Thereafter, Scott filed a complaint with the Maine Human Rights Commission. When conciliation efforts failed, Scott filed two complaints in the Superior Court, the first covering the July 2000 incarceration and the second covering the September 2000 incarceration. Scott's complaints were consolidated. He alleges that because he was not given his medication as prescribed, he suffered physical "withdrawal" symptoms such as nausea, headaches, and fatigue, and was prevented from participating in jail programs such as recreation, outdoor exercise, and meals. He sought damages, attorney fees, and costs.

[¶ 13] The County filed a motion for summary judgment. The trial court found that disputed issues of fact exist as to whether Scott actually experienced symptoms due to the altered medication schedule. The court determined that the disputes of fact were immaterial, however, because Scott did not state facts to demonstrate that he had a genuine need for accommodation, or that the County was deliberately indifferent to Scott's medical condition. Accordingly, the court granted a summary judgment on Scott's ADA and MHRA claims. Scott then filed this appeal.

## II. STANDARD OF REVIEW

[¶ 14] The existence of a dispute of material fact and entry of summary judgment are questions of law that we review de novo. *Botka v. S.C. Noyes & Co.*, 2003 ME 128, ¶ 18, 834 A.2d 947, 952–53. We consider the evidence in the light most favorable to the party against whom judgment has been entered to decide whether the parties' statements of material facts and the referenced record evidence reveal a genuine issue of material fact, and whether the moving party was entitled to judgment as a matter of law. *Id.* To survive a defendant's motion for a summary judgment, a plaintiff must establish a prima facie case for each element of the cause of action. *Doyle v. Dep't of Human Servs.*, 2003 ME 61, ¶ 9, 824 A.2d 48, 52. If the plaintiff presents insufficient evidence on an essential element of the cause of action, such that " 'the defendant would . . . be entitled to judgment as a matter of law on that state of the evidence at a trial, the defendant is entitled to a summary judgment.' " *Id.* (quoting *Johnson v. Carleton*, 2001 ME 12, ¶ 11, 765 A.2d 571, 575).

[¶ 15] Accordingly, we must decide whether the facts presented in the parties'

statements of material facts and the supporting evidentiary materials, with disputes resolved in Scott's favor, establish an actionable claim under the ADA and the MHRA.

## III. THE ADA AND THE MHRA

■ [¶ 16] Because the public entity provisions of the Maine Human Rights Act[1] generally track the language of the similar provisions in the ADA, " 'it is appropriate to look to federal precedent for guidance in interpreting the MHRA.' " *Doyle,* 2003 ME 61, ¶ 14 n. 7, 824 A.2d at 54 (quoting *Winston v. Me. Technical Coll. Sys.,* 631 A.2d 70, 74–75 (Me.1993)). *See also Dudley v. Hannaford Bros. Co.,* 333 F.3d 299, 312 (1st Cir.2003).

■ [¶ 17] Title II of the ADA prohibits discrimination as follows:

> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C.A. § 12132. Thus, to recover pursuant to the ADA or the MHRA, Scott must establish that (1) he is a qualified individual with a disability; (2) he was excluded from participating in or denied the benefits of the public entity's services, programs, or activities, or otherwise discriminated against; and (3) such exclusion, denial of benefits, or discrimination was by reason of his disability. *Parker v. Universidad de Puerto Rico,* 225 F.3d 1, 5 (1st Cir.2000).

[¶ 18] The ADA and the MHRA define the term "public entity" to include state and local governments, as well as their agencies, departments, and instrumentalities. 42 U.S.C.A. § 12131(1); 5 M.R.S.A. § 4553(8–C) (2002). A state correctional facility has been determined to be a public entity covered by Title II of the ADA. *Pennsylvania Dep't of Corr. v. Yeskey,* 524 U.S. 206, 210, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998); *McNally v. Prison Health Servs.,* 46 F.Supp.2d 49, 57–58 (D.Me. 1999). The County does not dispute that the county jail is a public entity pursuant to the ADA and the MHRA.

■ [¶ 19] Educational, recreational, medical and other programs provided by a correctional facility are programs of a public entity, *Yeskey,* 524 U.S. at 210, 118 S.Ct. 1952, as is use of the dining hall, *Crawford v. Indiana Dep't of Corr.,* 115 F.3d 481, 483 (7th Cir.1997) *(abrogated on*

---

1. The relevant portions of the MHRA are as follows:

   It is unlawful public accommodations discrimination, in violation of this Act:
   1. Denial of Public Accommodations. For any public accommodation or any person who is the owner, lessor, lessee, proprietor, operator, manager, superintendent, agent or employee of any place of public accommodation to directly or indirectly refuse, discriminate against or in any manner withhold from or deny the full and equal enjoyment to any person, on account of race or color, sex, physical or mental disability, religion, ancestry or national origin, any of the accommodations, advantages, facilities, goods, services or privileges of public accommodation, or in any manner discriminate against any person in the price, terms or conditions upon which access to accommodation, advantages, facilities, goods, services and privileges may depend. For purposes of this subsection, unlawful discrimination also includes, but is not limited to:
   . . . .
   E. A qualified individual with a disability, by reason of that disability, being excluded from participation in or being denied the benefits of the services, programs or activities of a public entity, or being subjected to discrimination by any such entity[.]

   5 M.R.S.A. § 4592 (2002).

*other grounds by Erickson v. Bd. of Governors for N.E. Ill. Univ.*, 207 F.3d 945, 948 (7th Cir.2000)). Public entities are required to make their services, programs, or activities "readily accessible to and usable by individuals with disabilities" except where compliance would result in a "fundamental alteration" or "undue financial and administrative burdens." 28 C.F.R. § 35.150(a) (2004); *Parker*, 225 F.3d at 5.

[¶ 20] A "qualified individual with a disability" is defined in the ADA as follows:

> an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

42 U.S.C.A. § 12131(2). The MHRA definition is nearly identical. 5 M.R.S.A. § 4553(8–D)(B).

[¶ 21] There is no dispute that Scott is a qualified individual with a disability or that he was eligible to receive services or participate in jail programs or activities such as meals, outdoor time, and recreation. Scott alleges that because the jail did not alter its medication schedule to meet his demands, he became ill, and his jailers thereby denied him access to recreation, outdoor time, and meals. He also contends that he was not provided adequate medical care. At issue is whether, pursuant to the ADA and the MHRA, the facts establish Scott's entitlement to damages.

## IV. ENTITLEMENT TO DAMAGES

[¶ 22] The law governing the availability of compensatory damages for violations of Americans with Disabilities Act is far from settled. In *Tennessee v. Lane*, 541 U.S. 509, 124 S.Ct. 1978, 158 L.Ed.2d 820 (2004), the United States Supreme Court held that in enacting Title II of the ADA, Congress effectively abrogated the States' sovereign immunity under the Eleventh Amendment to the United States Constitution, thereby subjecting the States to suits for money damages in cases implicating the fundamental constitutional right of access to the courts. *Id.* at 1994. While the Court suggests that Title II was designed to address unequal treatment in other state services and programs related to the administration of justice, including state penal systems, it limited its decision to that "class of cases implicating the fundamental right of access to the courts." *Id.* at 1989–90. The Court left open the issue of whether immunity is abrogated in cases implicating statutory violations or other constitutional rights.[2] *Id.* at 1993–94.

[¶ 23] While the Eleventh Amendment is inapplicable in state courts, absent

2. In a post-*Lane* case brought by a prison inmate, the Eleventh Circuit interpreted *Lane* to merely require a "context by context" approach for determining immunity, and held that compensation for ADA violations is not limited to conduct that would amount to a constitutional violation. *Miller v. King*, 384 F.3d 1248 (11th Cir.2004).

In *Kiman v. N.H. Dep't of Corr.*, 301 F.3d 13, 25 (1st Cir.2002), a panel of the First Circuit had determined that the Eleventh Amendment did not bar recovery by a disabled prison inmate because the conduct at issue rose to the level of a constitutional violation. However, that decision was vacated and the case reheard by the First Circuit en banc, and an evenly divided en banc court affirmed the District Court's dismissal of the plaintiff's ADA claims. *Kiman v. N.H. Dep't of Corr.*, 332 F.3d 29 (1st Cir.2003) (en banc). On petition for certiorari, the Supreme Court vacated the First Circuit's en banc judgment and remanded the case to the First Circuit for further consideration in light of *Lane*. *Kiman v. N.H. Dep't of Corr.*, —— U.S. ——, 124 S.Ct. 2387, 158 L.Ed.2d 961 (2004).

a waiver, the State of Maine retains its privilege to assert sovereign immunity in its own courts. *See Alden v. Maine,* 527 U.S. 706, 735–36, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999); *Jackson v. State,* 544 A.2d 291, 298–99 (Me.1988) (holding that the State may interpose its sovereign immunity in state court as a bar to an award of damages under section 504 of the Rehabilitation Act). Because we determine that Scott has not established an actionable claim for liability, we do not reach the issue of whether Scott's claims may be barred by sovereign immunity.

[¶ 24] In the absence of an immunity bar, federal courts have generally held that compensatory damages are available pursuant to the ADA upon a showing of intentional discrimination. *See, e.g., Ferguson v. City of Phoenix,* 157 F.3d 668, 674 (9th Cir.1998). In order to show intentional discrimination, a plaintiff must demonstrate either "discriminatory animus" or "deliberate indifference." *Id.* at 675. The "discriminatory animus" or "ill will" standard requires proof of "conduct that is based on irrational prejudice or wholly lacking a legitimate government interest." *Garcia v. State Univ. of N.Y. Health Sciences Ctr.,* 280 F.3d 98, 111–12 (2nd Cir.2001) (determining that a showing of discriminatory animus or ill will is necessary to recover damages under Title II of the ADA in an action against the State).

[¶ 25] Most jurisdictions have employed the deliberate indifference standard in assessing entitlement to damages under Title II of the ADA or section 504[3] of the Rehabilitation Act. *See* Laurence Paradis, *Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act: Making Programs, Services, and Activities Accessible to All,* 14 STAN. L. & POLICY REV., 389, 391–92 (2003).[4] For purposes of the ADA, deliberate indifference "requires both knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that likelihood." *Duvall v. County of Kitsap,* 260 F.3d 1124, 1138–39 (9th Cir.2001). The "knowledge" element is established when the public entity has notice of the plaintiff's accommodation need, and the "failure to act" element is established by "conduct that is more than negligent, and involves an element of deliberateness." *Id.* at 1139. When a public entity receives notice of a request for accommodation, it must "undertake a fact-specific investigation" to determine "what accommodations are necessary." *Id.*

[¶ 26] The trial court imported the standard for deliberate indifference applicable to cases brought pursuant to 42 U.S.C.A. § 1983, alleging cruel and unusual punishment under the Eighth Amendment to the United States Constitution.

3. Section 504 of the Rehabilitation Act, 29 U.S.C.A. § 794 (1999), is materially identical to Title II of the ADA except that it is limited to programs that receive federal financial assistance. *Crawford v. Ind. Dep't of Corr.,* 115 F.3d 481, 483 (7th Cir.1997) (*abrogated on other grounds by Erickson,* 207 F.3d 945).

4. *See Duvall v. County of Kitsap,* 260 F.3d 1124, 1138 (9th Cir.2001); *Powers v. MJB Acquisition Corp.,* 184 F.3d 1147, 1153 (10th Cir.1999); *Bartlett v. N.Y. State Bd. of Law Exam'rs,* 156 F.3d 321, 331 (2d Cir.1998), *vacated on other grounds by* 527 U.S. 1031, 119 S.Ct. 2388, 144 L.Ed.2d 790 (1999); *Pandazides v. Va. Bd. of Educ.,* 13 F.3d 823, 830 n. 9 (4th Cir.1994) (holding that a plaintiff need not show discriminatory animus to recover compensatory damages); *Wood v. President & Trustees of Spring Hill Coll.,* 978 F.2d 1214, 1219–20 (11th Cir.1992) (holding plaintiffs must prove intentional discrimination or bad faith to recover compensatory damage, but it was harmless error in that case to instruct jury alternatively on discriminatory animus).

Pursuant to the Eighth Amendment, a prison official may be held liable only if that official has knowledge that an inmate faces a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it. For this proposition, the trial court relied on *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), and *Farmer v. Brennan*, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994), both Eighth Amendment cases.

[¶ 27] Scott acknowledges that intentional discrimination must be proved. He contends, correctly, that the "deliberate indifference" standard by which intentional discrimination is measured pursuant to the ADA is different from, and less rigorous than, the "deliberate indifference" standard by which an Eighth Amendment violation is measured. He asserts that the trial court should have applied the standard established in *Duvall* and adopted in most Circuits.

[¶ 28] We adopt the view expressed in *Duvall*, that, as a prerequisite to recovery under the public entity provisions of the ADA or the MHRA, a plaintiff must show deliberate indifference; that is, that a defendant had knowledge that a harm to a federally protected right was substantially likely, and failed to act upon that likelihood. *See Duvall*, 260 F.3d at 1139. Accordingly, for Scott to prevail on the issue of intentional discrimination or deliberate indifference, he must present some evidence showing that County officials knew that if they did not accommodate his medication schedule, it was substantially likely that Scott would be excluded from jail programs because of his disability, and with this knowledge, they refused to accommodate him.

[¶ 29] The undisputed facts show that after Scott requested an accommodation, the physician's assistant conducted an investigation to determine whether the accommodation was necessary. After conducting research and consulting other medical providers, including Scott's treating psychiatrist, the physician's assistant concluded, in his medical judgment, that Scott would not experience significant withdrawal symptoms as a result of taking the same amount of medication three times per day instead of five. There is also evidence that is not adequately controverted that a number of Scott's claimed symptoms of distress did not occur or could not have occurred as Scott claimed they had occurred. Therefore, the County's skeptical response to some of Scott's claimed symptoms had a reasonable basis in fact based on the County's fact-specific investigation. Further, the record indicates that the County's actions in July and September were based on a reasonable medical judgment by the jail's medical providers and that, therefore, the problems alleged by Scott did not arise from a deliberate indifference to accommodating Scott's disability. *Duvall*, 260 F.3d at 1139.

[¶ 30] There is no evidence in the record that any accommodation was refused with the intended outcome that Scott be excluded from jail programs because of his disability. Knowledge that Scott might suffer from mild symptoms does not equate to knowledge that he would not be able to go to the dining hall or participate in outdoor recreation. The fact that it was more difficult for Scott to attend meals or recreation time does not amount to a disability-based exclusion.

[¶ 31] Scott contends that there is also a question of fact as to whether he received proper medical care for his symptoms. He argues that the quality of care he received did not meet the standard of care established in the jail's policy manual. A claim for negligent medical treat-

ment for a disability is not actionable pursuant to the ADA. *Bryant v. Madigan,* 84 F.3d 246, 249 (7th Cir.1996). However, a disabled inmate can recover under the ADA for a claim related to medical services upon showing that he was intentionally treated differently from other inmates because of his disability. *McNally,* 46 F.Supp.2d at 58–59 (denying defendant's motion for summary judgment when record established that new HIV-positive inmates had to take a blood test before they could resume taking their prescribed medications, but inmates suffering from other illnesses were provided immediate access to their medications).

[¶ 32] Because Scott does not point to facts that show he was intentionally treated differently because of his disability, or that he was treated with deliberate indifference, he failed to establish a violation of the ADA or the MHRA.

The entry is:

Judgment affirmed.