2005 ME 97

**Gayle A. FITZPATRICK et al.**

v.

**TOWN OF FALMOUTH et al.**

Supreme Judicial Court of Maine.

Argued: June 14, 2005.
Decided: Aug. 10, 2005.

---

Ronald R. Coles (orally), Kennebunk, for plaintiffs.

Melissa A. Hewey (orally), Drumond, Woodsum & MacMahon, Portland, for defendants.

Panel: SAUFLEY, C.J., and CLIFFORD, DANA, ALEXANDER, CALKINS, and LEVY, JJ.*

CALKINS, J.

[¶ 1] Gayle A. Fitzpatrick and Charles A. Rankowski appeal from a judgment entered in the Superior Court (Cumberland County, *Humphrey, C.J.*) denying their request for a preliminary and permanent injunction and from a summary judgment in favor of the Town of Falmouth and the other defendants, who are school officials with the Falmouth School Department.[1] Fitzpatrick and Rankowski are the parents of J.R., who has been diagnosed with Asperger's Disorder Autism. They challenged the actions of the school officials in suspending J.R. from using the Plummer School playground. Although the parents alleged several claims in both the federal district court and the Superior Court, the only claims remaining on appeal were brought pursuant to the Maine Human Rights Act (MHRA). 5 M.R.S.A. §§ 4592, 4601 (2002). The parents contend that the Superior Court erred and abused its discretion in concluding that they were required to exhaust administrative remedies before they could bring their claim for education discrimination. They further ar-

---

* Justice Paul L. Rudman sat at oral argument and participated in the initial conference, but retired before this opinion was certified.

1. The defendants named in the complaint are the Town of Falmouth, the chairman of the Falmouth School Board, and three employees of the Town of Falmouth: the director of special services for the Falmouth School Department, the principal of the Plummer Motz/Lunt Elementary School in Falmouth, and the superintendent of the Falmouth schools. The term "school officials" herein includes all of the defendants.

gue that the court erred in finding that the school officials did not discriminate against J.R. on the basis of his disability and in finding that J.R.'s behavior posed a significant risk to the health and safety of others, which meant that the school officials did not unlawfully deny the use of public accommodations to him. We affirm the judgment.

## I.  BACKGROUND

### A.  Procedure

[¶ 2] J.R.'s parents brought a complaint against the school officials in the Superior Court in February 2004 challenging the suspension of their son from the Plummer School playground. The complaint alleged several federal and state claims, both constitutional and statutory.

[¶ 3] The school officials removed the case to the federal district court, which dismissed the federal claims. The primary basis for the dismissal was the parents' failure to exhaust administrative remedies. The court concluded that the requested relief, that is, the restoration of J.R.'s playground privileges, was relief available under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C.A. §§ 1400–1482 (West 2000 & Supp.2005), and IDEA requires exhaustion of administrative remedies for claims seeking relief that is available under it, even when the action is brought pursuant to another federal statute. *Fitzpatrick v. Town of Falmouth*, 321 F.Supp.2d 119, 127–28 (D.Me.2004). The federal court remanded the state claims back to the Superior Court. *Fitzpatrick v. Town of Falmouth*, 324 F.Supp.2d 95, 100 (D.Me.2004).

[¶ 4] In the Superior Court, J.R.'s parents amended the complaint to delete the federal claims. The remaining state law claims included two claims under the MHRA: a claim for education discrimination, pursuant to 5 M.R.S.A. § 4601, and a claim for public accommodations discrimination, pursuant to 5 M.R.S.A. § 4592. A third claim alleged a violation of the Equal Protection and Due Process Clauses of the Maine Constitution. The only relief requested for these three claims was a preliminary and permanent injunction. In addition, the parents alleged two claims for the intentional infliction of emotional distress, which requested damages.

[¶ 5] The school officials filed a motion for summary judgment accompanied by a statement of material facts. While that motion was pending, the court held an evidentiary hearing on the parents' request for an injunction. The court consolidated the hearing on the request for a preliminary injunction with a hearing on the request for a permanent injunction. *See* M.R. Civ. P. 65(b)(2). The court issued a thorough opinion detailing its findings and conclusions. The court concluded: "Based upon the foregoing, the plaintiffs have not demonstrated a likelihood of success on the merits of their discrimination and constitutional claims and their motion for a preliminary and permanent injunction must be denied."

[¶ 6] The parents voluntarily dismissed the two claims for intentional infliction of emotional distress. The court subsequently granted the school officials' motion for summary judgment and entered judgment for the school officials, "for the reasons recited in the [judgment denying injunctive relief]." [2]

---

**2.** There was some confusion regarding the docketing of the judgment denying the preliminary and permanent injunctions in that it was docketed twice. The parents' notice of

appeal was timely as to one of the docketing dates. Apparently because of the double docketing of the judgment denying injunctive relief, the court granted an enlargement of

## B. Facts

[¶ 7] The Superior Court found the following facts after consideration of the evidence submitted at the hearing on the request for the preliminary and permanent injunction. J.R. is a child with Asperger's Disorder Autism who, in September 2003, was a home-schooled fourth-grader residing with his parents in Falmouth. Asperger's is a neurological disorder on the autism spectrum, which, in this case, has affected the development of J.R.'s social and language skills. The disorder limits his ability to understand the facial expressions and verbal cues of others, but his cognitive abilities and IQ level are strong.

[¶ 8] Although J.R. was not an enrolled student at a Falmouth school, a Pupil Evaluation Team (PET) meeting was held in September 2003 by the school and the parents in order to develop a service plan for J.R. that would allow him to use some of the school's facilities and enable him to interact with other students. At the parents' request, the school officials allowed J.R. access to the school playground to give him the opportunity to play with other children and develop his social and communication skills.

[¶ 9] Shortly after J.R. began to use the playground, the school principal received complaints from some students regarding J.R.'s behavior. She was told that J.R. kneed a student in the groin, used offensive or threatening language, and threw rocks. The principal spoke with J.R.'s mother regarding the complaints. The mother replied that J.R. had done nothing wrong, but rather, the other students were bullying him. The principal determined that the complaints of both the mother and the other students were credible.

[¶ 10] Soon thereafter, the mother met with the principal and the special education teacher, who is J.R.'s case manager, to discuss the alleged misbehavior. They agreed that an adult should observe J.R. when he was on the playground, and an education technician began the observation of J.R. on the playground.

[¶ 11] The principal received additional complaints from teachers and administrators regarding J.R.'s inappropriate behavior on the playground, such as using equipment too roughly and being nonresponsive and disrespectful to teachers. Following these reports, the principal and another special education teacher, who is an autism specialist, approached the mother on the playground and said that J.R. had to be responsive to other adults assigned to the playground. The mother replied that J.R. had been taught not to respond to other adults. The mother became agitated and left the playground.

[¶ 12] On another occasion, a school employee complained to the principal that J.R. was monopolizing the time of a particular third-grade child and that J.R. swore at other students who wanted to play with the third-grade child. The principal went to the playground to speak to J.R., who became angry. The principal then told J.R. and his home-school provider to leave the playground area, and J.R. yelled at her and ran into the woods.

[¶ 13] The principal was concerned with J.R.'s behavior and its effect on his and others' safety and on other children's educational development. The principal spoke with the mother about the situation, and the mother stated that J.R. should not have to respond to adults that he does not know or trust. The principal pointed out

time to allow the parents to appeal both the judgment denying the injunction and the sum-

mary judgment.

the school policy regarding disrespect to an appropriate adult authority, which policy requires that the child write a letter of apology and lose playground privileges. The mother replied that the school policy was "interesting," but that J.R. was not a student at the elementary school.

[¶ 14] On November 7, 2003, J.R.'s case manager observed J.R. and another child on the tire swing. J.R. was standing on the swing, and it was going too fast. The case manager attempted to intervene, and J.R. called her a "bastard" and told the other children not to listen to her. The mother arrived and spoke briefly with the case manager. The principal went to the playground and, after talking with the case manager and the mother, the principal told the mother that she and J.R. had to leave the playground immediately. J.R. swore at the autism specialist, and, eventually, the mother and J.R. left the playground.

[¶ 15] Later that day, the principal met with the superintendent and the director of special services for the school department. The three decided to temporarily suspend J.R. from the playground during school hours until the school officials and parents met to design a plan for J.R. and the school staff regarding the playground.

[¶ 16] On November 24, the principal, the superintendent, the director of special services, the mother, and the mother's attorney attended a PET meeting, during which the school officials requested permission from the parents for a Functional Behavioral Assessment (FBA) of J.R.[3] The court found that "the FBA itself would have required the almost immediate return [of J.R.] to the playground so that he could be observed in that environment." However, the parents notified the principal by letter that they would not consent to an FBA, stating that it was unnecessary and would not be in J.R.'s best interest. As of the date of the hearing on the injunction, J.R. remained suspended from the playground.

## II. DISCUSSION

### A. Standard of Review

[¶ 17] The parents argue that because the court granted the school officials' summary judgment motion, it is the summary judgment that is on appeal, and the appropriate standard of review is de novo review. *See Lever v. Acadia Hosp. Corp.,* 2004 ME 35, ¶ 2, 845 A.2d 1178, 1179. We disagree. Here, the court denied injunctive relief because it found that the parents did not prove that the school officials violated the MHRA or the Maine Constitution.[4] The decision denying preliminary and permanent injunctive relief completely decided those claims because the parents requested only injunctive relief. Once the two emotional distress claims were voluntarily dismissed by the parents, all claims had been disposed of, and the court's summary judgment was unnecessary.

[¶ 18] It is possible that the reason the court issued the summary judgment

---

3. As defined in the special education regulations, an FBA is

     a school-based process used by the Pupil Evaluation Team, which includes the parent and, as appropriate, the student, to determine why a student engages in challenging behaviors and how the behavior relates to the student's environment. [It] includes direct assessments, indirect assessments, and data analysis designed to assist the P.E.T. to identify and define the problem behavior in concrete terms; identify the

contextual factors (including affective and cognitive factors) that contribute to the behavior; and formulate a hypothesis regarding the general conditions under which a behavior usually occurs and the probable consequences that maintain the behavior. 10 C.M.R. 05 071 101–11 § 2.10 (1999).

4. The parents have not appealed from the court's determination that the school officials did not violate J.R.'s constitutional rights.

was because it had stated in its order denying the preliminary and permanent injunction that "the plaintiffs have not demonstrated a likelihood of success on the merits." However, when a court has consolidated the hearing and decision on a preliminary injunction request with a trial on the merits of the request for a permanent injunction pursuant to M.R. Civ. P. 65(b)(2), and the parties have not requested any relief other than an injunction, the court has decided the merits and not just the likelihood of success on the merits. We recognize that in *Ingraham v. University of Maine at Orono*, we said that one of the criteria that must be met "[b]efore granting a preliminary or *permanent* injunction," is that the plaintiff exhibits a likelihood of success on the merits. 441 A.2d 691, 693 (Me.1982) (emphasis added). However, as commentators have noted: "The criterion has no significance when the court reaches the merits by determining a request for permanent injunction or by consolidating the hearing on preliminary injunction with the hearing on the merits." Horton & McGehee, *Maine Civil Remedies* § 5–3(d) at 107 n. 56 (4th ed. 2004); *see also Walsh v. Johnston*, 608 A.2d 776, 778 (Me.1992) (setting forth the criteria for granting a permanent injunction). For a permanent injunction, the criterion from *Ingraham* regarding the merits is more accurately expressed as "the plaintiff succeeds on the merits."

[¶ 19] Accordingly, we review the court's decision on the merits of the parents' claims as set forth in its order denying the preliminary and permanent injunction. Thus, we review the court's findings of fact under the clearly erroneous standard and conclusions of law de novo.

B.  Maine Human Rights Act Claims

1.  Education Discrimination

[¶ 20] The parents claimed that the school officials violated J.R.'s right to par-

ticipate in an educational program free from discrimination. The MHRA declares that it is a civil right "for an individual at an educational institution to participate in all educational [programs]" without discrimination because of, inter alia, a physical or mental disability. 5 M.R.S.A. § 4601. Section 4602(2)(A) of the MHRA provides that the exclusion of an otherwise qualified individual from participation in any educational program or activity solely on the basis of physical or mental disability is unlawful education discrimination. 5 M.R.S.A. § 4602(2)(A) (2002). Section 4602(2) also states: "Nothing in this subsection may be construed to cover the rights of exceptional students to special education programs under state or federal law." 5 M.R.S.A. § 4602(2) (2002).

[¶ 21] Although the Superior Court could have concluded that the parents had not stated a claim under the education discrimination portion of the MHRA because of the exclusionary language in section 4602(2), it instead looked past the wording of the complaint and interpreted the gravamen of the parents' MHRA education discrimination claim to be one that fell within the parameters of the special education laws. The court concluded that the parents were required to exhaust administrative remedies before pursuing a claim under the special education laws and because they had not exhausted remedies, they could not pursue the claim in court.

[¶ 22] The parents argue before us that because they did not allege a claim under the special education statutes, the court should have reached their MHRA education discrimination claim and not required exhaustion. The MHRA education discrimination claim cannot succeed, however, because of the provision in section 4602(2) excluding "the rights of exceptional

students to special education programs." This language is applicable to J.R. because he is an exceptional student as defined in the special education laws, *see* 20–A M.R.S.A. § 7001(2)(C)(8) (Supp.2004), and his use of the playground was permitted as part of his home-school program, *see* 20–A M.R.S.A. § 5021(6) (Supp.2004). The court found that the dispute between the parents and the school officials was triggered by the temporary suspension of J.R. from the playground and the school officials' request for an FBA and a behavior management plan. Because the basis of the parents' claim is that their son, an exceptional student, is entitled to playground privileges as part of a special education program, the exclusion in section 4602(2) is applicable, and its applicability defeats their claim of education discrimination under the MHRA.

## 2. Public Accommodations

[¶ 23] The parents claimed that the school officials discriminated against J.R. under the MHRA's public accommodations law. The MHRA declares that it is a civil right for every individual to have "equal access to places of public accommodation without discrimination because of race, color, sex, physical or mental disability, religion, ancestry or national origin." 5 M.R.S.A. § 4591 (2002). It is unlawful for a place of public accommodation to discriminate on the basis of a disability. *Id.* § 4592(1). There is no dispute that the playground is a place of public accommodation.

[¶ 24] Unlawful discrimination is defined in section 4592 to include the "failure to make reasonable modifications in policies, practices or procedures, when modifica-

tions are necessary to afford the ... facilities ... to individuals with disabilities." *Id.* § 4592(1)(B). Unlawful discrimination also includes the exclusion or denial by a public entity of a "qualified individual with a disability, by reason of that disability," from services and activities or from "being subjected to discrimination by any such entity." *Id.* § 4592(1)(E).

[¶ 25] However, places of public accommodation are not required to allow a person to use its facilities when the person "poses a direct threat to the health or safety of others." 5 M.R.S.A. § 4592. The term "direct threat" is defined as "a significant risk to the health or safety of others that can not be eliminated by a modification of policies, practices or procedures or by the provision of auxiliary aids or services." *Id.*

[¶ 26] The court found that J.R. posed a direct threat, that is, a significant risk to the health and safety of others on the playground, and, therefore, the school officials had not discriminated against him. The court further found that the suspension from the playground was not based on J.R.'s disability, but rather based on the school officials' "legitimate need to obtain an assessment of the child and develop a plan for his safe and beneficial use of the facility." Because we affirm the decision on a different rationale than that of the court, we do not reach the question of whether the court erred in its conclusion that J.R.'s behavior met the statutory definition of "direct threat," or in its determination that the school officials did not discriminate against J.R. on the basis of his disability.

[¶ 27] J.R.'s service plan gave him the right to use the playground.[5] The court

---

5. Although a home-schooled student, J.R. was allowed to use the playground on the same basis as the enrolled students as long as the conditions in 20–A M.R.S.A. § 5021(6) (Supp.

2004) were met. The use of school facilities by home-schooled students is subject to approval by the principal, *id.* § 5021(6)(B), and the use must "not disrupt regular school ac-

found that after J.R. began to use the playground, other students accused him of kneeing a student in the groin. On the playground, J.R. had used offensive or threatening language, thrown rocks, used playground equipment too roughly, been rude and disrespectful to supervisors, and swung on the tire swing too fast. The court found that the school officials were concerned with J.R.'s behavior on the playground and its effect on his and others' safety and educational development. The record supports these findings.

[¶ 28] Because of the similarity between the MHRA and the federal Americans with Disabilities Act (ADA), 42 U.S.C.A. §§ 12101–12213 (West 1995 & Pamph. 2005), we utilize federal cases interpreting the ADA when we interpret comparable provisions in the MHRA. *Scott v. Androscoggin County Jail*, 2004 ME 143, ¶ 16, 866 A.2d 88, 93. The "direct threat" provision in 5 M.R.S.A. § 4592, is also contained in the ADA, 42 U.S.C.A. § 12182(b)(3) (1995), and is interpreted to mean that entities operating places of public accommodation that are concerned with the safety risks posed by a disabled individual must determine whether that individual constitutes a direct threat. *Montalvo v. Radcliffe*, 167 F.3d 873, 876–77 (4th Cir.1999). When making such a determination, a public accommodation entity "must not base its calculus on stereotypes or generalizations about the effects of a disability but rather must make an individualized assessment, based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence." *Id.* (quotation marks omitted).

[¶ 29] The relevant factors that the entity providing the place of public accommodation must weigh and balance are "the nature, duration, and severity of the risk and the probability that the potential injury will actually occur." *Id.* at 877 (quotation marks and alterations omitted). Under the ADA, when an entity providing a place of public accommodation identifies a disabled individual as posing significant risk to the health and safety of others, it must assess whether that risk can be eliminated by "reasonable modifications of policies, practices or procedures." *Id.* (quotation marks omitted). Likewise, because the MHRA defines "direct threat" to mean a "significant risk ... that can not be eliminated by a modification of policies, practices or procedures or by the provision of auxiliary aids or services," 5 M.R.S.A. § 4952, we interpret the MHRA to mean that the public accommodation entity must ascertain whether any modification to its policies, or whether providing any auxiliary services, will eliminate the significant risk that it has identified.

[¶ 30] Here, the school officials perceived that J.R. posed a significant risk to himself and other students, and that some kind of modification to its policies and procedures or to J.R.'s service plan, may ameliorate such a risk. The court found that the school officials' safety concerns prompted it to temporarily suspend J.R.'s use of the playground "only until a safe and effective behavioral plan could be developed for [J.R.] and the school's personnel."

[¶ 31] The Court of Appeals for the Sixth Circuit held that an entity providing a place of public accommodation was not liable for discrimination during an interim period in which it was requesting addition-

tivities," *id.* § 5021(6)(A). Furthermore, the use of "potentially hazardous areas" must be "supervised by a qualified employee of the school administrative unit." *Id.* § 5021(6)(D).

al information. *Doe v. Woodford County Bd. of Educ.*, 213 F.3d 921, 925 (6th Cir. 2000). In that case, the school had placed a student basketball player on "hold" status, preventing him from playing with the team, until the school could determine whether or not the fact that he was a hemophiliac and carried the hepatitis B virus made him a direct threat to others on the team. *Id.* at 923–24. The school requested his parents to provide medical information and when the furnished information appeared inadequate, it sought more information. *Id.* at 924. The ultimate determination of whether the student posed a direct threat was irrelevant; the school had not discriminated against him in the time period in which it held meetings and gathered medical information necessary to its determination of whether or not a direct threat existed that could not be eliminated by modification. *Id.* at 925–26.

[¶ 32] Here, the school temporarily suspended J.R. to determine whether he posed a direct threat that could not be eliminated by modification. This temporary suspension appears to be an attempt "to balance the need of protecting [other students] with [J.R.'s] rights not to be treated differently due to his disability." *Id.* at 926. As in *Woodford County Board of Education,* it was "entirely reasonable for [the school officials] to be concerned and arguably [they] were obligated to be concerned with limiting risk of [injury] to others as well as limiting any injury that [the child] may suffer." *Id.*

[¶ 33] The Falmouth school officials requested that J.R.'s parents consent to the FBA. The court found that the school officials' request for the behavioral assessment "was reasonable and well-suited to the timely and effective return of [J.R.] to the playground." The court found that J.R.'s mother acknowledged that the school officials needed to understand his

disability. The school officials requested the FBA in order to "ascertain and implement" modifications that would allow J.R. to resume use of the playground. The FBA would have enabled the school officials to make an "individualized assessment, based on reasonable judgment that relies on current medical knowledge or . . . objective evidence." *Montalvo,* 167 F.3d at 876–77 (quotation marks omitted). As the court found, the FBA itself would have required J.R.'s immediate return to the playground because in order to do the FBA, the assessors would have to observe J.R. in the playground environment.

[¶ 34] Without the parental consent necessary for the FBA, the school officials were prevented from making the determination they are required to make under the law. The parents' refusal to consent to the FBA meant that the school officials were unable to determine whether J.R.'s behavior constituted a direct threat and if so, what modifications, if any, could eliminate it. The school officials did not unlawfully discriminate against J.R. by temporarily suspending him in order to make that determination.

The entry is:

Judgment affirmed.