2009 ME 29

**WINDHAM LAND TRUST et al.**

v.

**Russell I. JEFFORDS et al.**

Supreme Judicial Court of Maine.

Argued: Jan. 15, 2009.
Decided: March 19, 2009.

Chris Neagle, Esq. (orally), Troubh Heisler, Portland, ME, for Russell L. Jeffords and Susan A. Poulin.

G. Steven Rowe, Attorney General, Amy B. Mills, Asst. Atty. Gen. (orally), Linda J.

Conti, Asst. Atty. Gen., Augusta, ME, for the State of Maine.

Marcia G. Corradini, Esq., Jensen Baird Gardner Henry, Portland, ME, for the Windham Land Trust.

Panel: SAUFLEY, C.J., and CLIFFORD, ALEXANDER, LEVY, SILVER, MEAD, and GORMAN, JJ.

ALEXANDER, J.

[¶ 1] Russell I. Jeffords and Susan A. Poulin (the Owners) appeal from a summary judgment entered in, and a permanent injunction issued by, the Superior Court (Cumberland County, *Cole, J.*) in favor of the Windham Land Trust and the State of Maine concerning land owned by the Owners over which the Trust holds a conservation easement. The Owners argue that the court erroneously: (1) allowed the State to intervene in the action; (2) denied their motions to dismiss the Trust's and State's complaints for failure to engage in contractually required mediation; (3) concluded that the Owners are prohibited under the terms of the conservation easement deed from using the land as they have proposed; and (4) granted a summary judgment, and issued a permanent injunction, because there are genuine issues of material fact in dispute. We affirm the summary judgment and the grant of the permanent injunction.

## I. CASE HISTORY

[¶ 2] The Owners hold title to 100 acres of land in Gray known as the Freeman Farm. The Owners purchased the Freeman Farm in 2004 from a couple who had previously acquired the property from the Estate of George L. Freeman. There are no deed restrictions on the front fifteen acres of the Freeman Farm, which contain farm buildings and the Owners' residence. The rear eighty-five acres (the Protected Parcel) are subject to a conservation easement (Conservation Easement).

[¶ 3] The Conservation Easement covering the rear eighty-five acres of the property was created in 2003 when the Freeman Estate donated the Conservation Easement to the Windham Land Trust, an entity described in the Internal Revenue Code, 26 U.S.C.S. § 501(c)(3) (2009). The Conservation Easement deed placed restrictions on the purposes for which the grantor, and its transferees, assignees, and successors-in-interest, could use the Protected Parcel. The deed states that the "dominant purpose" of the Conservation Easement is:

[T]o preserve and protect in perpetuity the natural, open space, scenic, aesthetic and ecological features and values of the Property while not limiting the Grantor's power to utilize the property for residential recreational purposes. In so doing, it is the purpose of this Easement to foster responsible conservation practices while permitting Grantor to engage in certain recreational uses on the Property.

Additionally, the deed provides:

Prior to commencing any court or administrative action regarding enforcement of this easement or any part thereof, as a precondition thereof, [the Trust] shall be required to engage in mediation in good faith with [the Owners], with a mutually acceptable mediator, or upon a failure to agree with a mediator appointed by Cumberland County Superior Court.

The Owners expressly agreed to be bound by the Conservation Easement when they acquired the Freeman Farm.

[¶ 4] The Protected Parcel is woodland through which several logging roads or trails run. The Owners originally planned to hold country music festivals on the front

fifteen acres, hoping to attract 1000 attendees, and to allow these attendees to camp on the Protected Parcel. The Owners also planned to operate a campground on the Protected Parcel for which they obtained a State permit for thirty-six tent and trailer campsites. The Owners assert that they no longer plan to operate a campground, admitting that such a use is prohibited by the Conservation Easement.[1] The Owners now plan to use the logging roads for wagon rides and horse-drawn sleigh rides, hiking, snowshoeing, and Nordic skiing, and to use a pond on the Protected Parcel for fishing and ice skating, all made available to "their paying guests." The Owners have stated that, if they cannot use the Protected Parcel for these commercial purposes, "they will not be able to generate income needed to maintain the trails and pond from these activities, either as separate charitable events or as part of larger events on the unprotected 15 acres such as weddings."

[¶ 5] The Owners claim that, in late 2005 and mid–2006, when they were formulating their planned uses of the Protected Parcel, the Trust's attorney told them that the Conservation Easement deed does not prohibit earning money from activities permitted under the deed and that the then-proposed campsites would not violate the deed. The Owners contend that they relied to their detriment upon the statements by the Trust's attorney in preparing their 2007 financial plan. The Owners also contend that the Freeman family intended the Protected Parcel to be used for horseback riding and horseback riding lessons, as evidenced by a "letter to the editor" written by a member of the Freeman family.

[¶ 6] Before filing this action, the Trust sent written notice to the Owners concerning the Owners' potential violation of the Conservation Easement deed. On November 1, 2006, the Trust contacted the Owners, asking them to choose one of two identified mediators by November 15 so that the parties could engage in the pre-litigation mediation required by the easement deed. The Trust advised the Owners that the Trust would consider an enforcement action in court if the parties could not successfully mediate the dispute.

[¶ 7] By a letter dated November 3, 2006, the Owners refused to engage in mediation, indicating that they did not, within the timeframe proposed by the Trust, "see if we need, or can have a mediator at this time." The Owners claim that they subsequently suggested mediation in February 2007, but that the Trust did not engage in mediation prior to filing its court action.

[¶ 8] The Trust filed a three-count complaint against the Owners on March 23, 2007, alleging that the Owners' use of the Protected Parcel for commercial purposes interfered with the Trust's Conservation Easement and seeking a declaratory judgment and injunctive relief against the Owners. The Owners filed a two-count counterclaim.

[¶ 9] The Trust filed a motion for a preliminary injunction, which the court (*Humphrey, C.J.*) granted on June 29, 2007, after a hearing. On November 30, 2007, the State moved to intervene on behalf of the Trust, although it did not accompany its motion with a complaint. On December 18, 2007, and January 3, 2008, the parties, including the State, engaged, unsuccessfully, in mediation pursuant to M.R. Civ. P. 16B. On January 2, 2008, the court (*Cole, J.*) granted the State's motion to intervene. The State

---

1. It appears from the record that the Owners did not abandon their plans to operate campsites on the Protected Parcel until after the State intervened in the case in January 2008.

filed its complaint against the Owners on April 14, 2008.

[¶ 10] The Owners then filed a motion to dismiss the Trust's and the State's respective complaints and to vacate the court's prior orders in the case, arguing for the first time that the court lacked jurisdiction because the parties had not engaged in pre-litigation mediation as required by the Conservation Easement deed. The Trust and the State filed a joint motion for summary judgment on May 20, 2008. After a hearing on the motions, the court denied the Owners' motions to dismiss and vacate. The court granted the Trust and State's motion for summary judgment, concluding that the Conservation Easement does not permit commercial use of the Protected Parcel as intended by the Owners. The court also permanently enjoined the Owners from "any collateral use of the Easement Parcel, recreation or otherwise by patrons or attendees of permitted commercial activities on the Front Parcel." The Owners filed this appeal.

## II.   LEGAL ANALYSIS

### A.   The State's Intervention

[¶ 11] The Owners contend that the court erred in granting the State's motion to intervene in this action, arguing that, contrary to the State's (and Trust's) contention, 33 M.R.S. § 478(1)(D) (2008) and 5 M.R.S. § 194 (2008) do not authorize the State's intervention. The Owners also argue that, because 33 M.R.S. § 478(1)(D) was enacted in 2007, four years after the Conservation Easement was created, it does not apply and that its application in this case is fundamentally unfair and alters the rights of the parties to the Conservation Easement in violation of the Contract Clauses in the Maine and United States Constitutions.

[¶ 12] "We review statutory interpretation de novo as a question of law." *Costain v. Sunbury Primary Care, P.A.*, 2008 ME 142, ¶ 5, 954 A.2d 1051, 1052. We do not look to legislative history or other extraneous aids to interpret a statute when the plain language of the statute is unambiguous, *see Liberty Ins. Underwriters, Inc. v. Estate of Faulkner*, 2008 ME 149, ¶ 15, 957 A.2d 94, 99, and we interpret a statute to "avoid absurd, illogical, or inconsistent results," *Costain*, 2008 ME 142, ¶ 5, 954 A.2d at 1053 (quotation marks omitted).

[¶ 13] M.R. Civ. P. 24(a) permits a party to intervene as of right when a statute confers an unconditional right to intervene. The State moved to intervene pursuant to 33 M.R.S. § 478 and 5 M.R.S. § 194.

[¶ 14] Title 33 M.R.S. § 478(1)(D) provides:

**1. Action or intervention.** An action affecting a conservation easement may be brought or intervened in by:

. . . .

**D.** The Attorney General; except that the Attorney General may initiate action seeking enforcement of a conservation easement only when the parties designated as having the right to do so under the terms of the conservation easement:

(1) Are no longer in legal existence;

(2) Are bankrupt or insolvent;

(3) Cannot be contacted after reasonable diligence to do so; or

(4) *After 90 days' prior written notice* by the Attorney General of the nature of the asserted failure, have failed to take reasonable actions to bring about compliance with the conservation easement.

[¶ 15] The plain language of section 478(1)(D) authorizes the State to *intervene* in an action that was initiated by another

party, as the State did in this case, and that affects a conservation easement, without showing the existence of any of the conditions precedent described in section 478(1)(D)(1)-(4). Paragraphs (1) through (4) apply only when the State *initiates* an action. Section 478(1)(D) confers upon the Attorney General an unconditional right to intervene in this action; accordingly, the State properly moved to intervene pursuant to M.R. Civ. P. 24(a) and filed a pleading, albeit belatedly, setting forth its claim for which intervention was sought, as is required by Rule 24(c).[2] Because the State properly intervened pursuant to 33 M.R.S. § 478 and Rule 24, we do not address whether the Attorney General also had a right to intervene in the dispute pursuant to 5 M.R.S. § 194.

[¶ 16] Additionally, we conclude that the application of section 478(1)(D), enacted in 2007, *see* P.L. 2007, ch. 412, § 5 (effective Sept. 20, 2007), authorizing the State to intervene in this case, is not fundamentally unfair, nor does it violate the Contract Clauses of the Maine and United States Constitutions. "The threshold inquiry when analyzing a Contract Clause claim is whether the legislation resulted in a substantial impairment of a contractual relationship." *Kittery Retail Ventures, LLC v. Town of Kittery*, 2004 ME 65, ¶ 38, 856 A.2d 1183, 1194–95 (quotation marks omitted). "Substantial impairment does not occur when a change in law does not affect the express terms of the contract or the obligations of the parties, but only affects the underlying subject matter of

the contract." *Id.* ¶ 41, 856 A.2d at 1196. The enactment of section 478(1)(D) did not substantially impair the contractual relationship between the Owners, as successors-in-interest of the Freeman Farm, and the Trust; the 2007 enactment of section 478(1)(D) did not affect the express terms of the 2003 Conservation Easement deed, the obligations of the Owners under that agreement, or the underlying subject matter of the deed.

[¶ 17] Accordingly, the court properly granted the State's motion to intervene.

B. Denial of the Owners' Motion to Dismiss

[¶ 18] The Owners contend that the court should have granted their motion to dismiss the Trust's and the State's complaints for lack of subject matter jurisdiction pursuant to M.R. Civ. P. 12(b)(1), arguing that neither party complied with the Conservation Easement's express requirement that they engage in mandatory mediation prior to commencing a lawsuit against the Owners.[3]

[¶ 19] Whether a court has subject matter jurisdiction is a question of law that we review de novo. *R.C. Moore, Inc. v. Les–Care Kitchens, Inc.*, 2007 ME 138, ¶ 18, 931 A.2d 1081, 1085.

[¶ 20] We have not previously addressed whether the parties' failure to engage in prelitigation mediation, required by a private contract, deprives a trial court of subject matter jurisdiction. *Cf. Hill v. Kwan*, 2009 ME 4, ¶¶ 7–9, 962 A.2d 963,

---

2. The State originally asserted before the trial court that it was authorized to intervene in the action pursuant to section 478(1)(D)(2) due to the Trust's insolvency. The record indicates that the Trust was not insolvent at the time the State intervened in the matter. Regardless, we may affirm the court's decision to grant the State's motion to intervene on grounds different from those considered by

the court. *See Griffin v. Town of Dedham*, 2002 ME 105, ¶ 11, 799 A.2d 1239, 1243.

3. The Owners make several additional arguments in support of their contention that the court erred in denying their motion to dismiss the State's complaint. Their arguments are without merit, and we do not discuss them further.

966 (indicating that the Superior Court lacked subject matter jurisdiction over a medical malpractice complaint that was filed before issuance of the statutorily required report of a prelitigation screening panel). However, we have discussed subject matter jurisdiction as distinct from a "condition precedent" or "a procedural requirement to invoke jurisdiction." *See Landmark Realty v. Leasure*, 2004 ME 85, ¶ 7 n. 1, 9, 853 A.2d 749, 750–51 (holding that the plaintiff's failure to follow a statutory claim-processing rule was a condition precedent and did not deprive the District Court of authority, i.e., subject matter jurisdiction, over the disclosure proceeding, a class of case over which the District Court has jurisdiction); *see generally Heck v. Geo. A. Hormel Co.*, 260 N.W.2d 421, 422–23 (Iowa 1977) (holding that an arbitration clause in a private contract merely imposed a condition precedent to the commencement of action and did not strip the court of subject matter jurisdiction).

■ [¶ 21] The Superior Court is a court of general jurisdiction and has jurisdiction to grant equitable relief. *See* 4 M.R.S. § 105 (2008); 14 M.R.S. § 6051 (2008). The court's jurisdiction over the subject matter of the dispute in this case is not contingent on whether the parties engaged in pre-litigation mediation, which is merely a condition precedent to filing suit created by the Conservation Easement. Accordingly, the parties' failure to engage in pre-litigation mediation did not strip the Superior Court of subject matter jurisdiction, and the court did not err in denying the Owners' motion to dismiss pursuant to M.R. Civ. P. 12(b)(1).[4]

4. The Owners argue, alternatively, that the State's complaint should have been dismissed pursuant to Rule 12(b)(6) for failure to state a claim due to its non-compliance with the Conservation Easement's notice and mediation requirements. Although the Owners' argument is not fully developed, we surmise that they are arguing that the court erred in failing to dismiss the case on grounds that conditions precedent to commencing litigation had not occurred. Treating the Owners' Rule 12(b)(6) motion as one for summary judgment, *see* M.R. Civ. P. 12(b), we reject this possible argument on the grounds that the Owners voluntarily waived their right to pre-litigation mediation. *See Dep't of Human Servs. v. Bell*, 1998 ME 123, ¶ 6, 711 A.2d 1292, 1294–95 ("Waiver is the voluntary and knowing relinquishment of a right and may be shown by a course of conduct signifying a purpose not to stand on a right, and leading, by a reasonable inference, to the conclusion that the right in question will not be insisted upon." (quotation marks omitted)); *see generally Saga Commc'ns of New England, Inc. v. Voornas*, 2000 ME 156, ¶ 7, 756 A.2d 954, 958 (stating that, when the underlying facts are undisputed, whether a party has waived its contractual right to arbitration is a question of law reviewed de novo).

There is ample evidence to support our conclusion. First, the Trust attempted to engage in mediation before suit was filed, but the Owners refused to participate at that time. In contrast, the record does not demonstrate whether the Owners made a meaningful offer to mediate that the Trust subsequently declined. Second, despite the Owners' assertion that they had only "recently realized" before filing their April 2008 motion to dismiss that the Conservation Easement deed required pre-litigation mediation, the Owners had a copy of the deed available to them at all times and were on actual notice of the deed's pre-litigation mediation requirement by the notice the Trust sent them in November 2006. Third, the Owners did not raise the issue of the parties' failure to engage in pre-litigation mediation until more than a year after litigation commenced and after participating in unsuccessful Rule 16B mediation. *See generally Macomber v. MacQuinn–Tweedie*, 2003 ME 121, ¶¶ 17, 20, 834 A.2d 131, 137, 138 (holding that the court correctly considered whether the doctrine of res judicata barred the plaintiffs from seeking to compel binding arbitration, noting their voluntary participation in prior proceedings and stating that "[c]ourts are better suited to determine the legal consequences of prior judicial proceedings and are reposed with inherent authority to control their dockets and promote judicial economy"); *Saga*, 2000 ME 156, ¶ 12, 756 A.2d at 959–60.

C. Grant of a Summary Judgment

[¶ 22] We review the court's grant of a summary judgment in favor of the Trust and State de novo, viewing the evidence in a light most favorable to the Owners, "to decide whether the parties' statements of material fact and referenced record evidence reveal a genuine issue of material fact." *Welch v. State,* 2006 ME 121, ¶ 11, 908 A.2d 1207, 1210 (quotation marks omitted); *Burdzel v. Sobus,* 2000 ME 84, ¶ 6, 750 A.2d 573, 575.

> 1. Whether the court erred in finding that the Owners' proposed uses of the Protected Parcel do not comply with the terms of the Conservation Easement.

[¶ 23] The Owners argue that the commercial activities they now propose to offer to the paying public are within the scope of allowable uses under the Conservation Easement, will cause no harm to the Protected Parcel, and that, even if their proposed use for the Protected Parcel would constitute a "commercial use," the Conservation Easement does not prohibit commercial uses and the grantors of the easement intended such uses.

[¶ 24] "The construction of a deed is a question of law that we review de novo." *N. Sebago Shores, LLC v. Mazzaglia,* 2007 ME 81, ¶ 13, 926 A.2d 728, 733.

> A court construing the language of a deed . . . must first attempt to construe the language . . . by looking only within the "four corners" of the instrument. In evaluating the language of a deed, courts should give effect to the common or everyday meanings of the words in the instrument. If the deed is unambiguous, the court must construe the deed without considering extrinsic evidence; if the deed is ambiguous, however, the court may admit extrinsic evidence of the parties' intent.

*Id.* (quotation marks and internal citations omitted) (alterations in original). In determining the intent of the parties to the deed, we look at the instrument as a whole. *Kinney v. Cent. Me. Power Co.,* 403 A.2d 346, 349 (Me.1979).

[¶ 25] The deed states that the Conservation Easement's "dominant purpose" is:

> [T]o preserve and protect in perpetuity the natural, open space, scenic, aesthetic and ecological features and values of the Property while not limiting the Grantor's power to utilize the property for residential recreational purposes. In so doing, it is the purpose of this Easement to foster responsible conservation practices while permitting Grantor to engage in certain recreational uses on the Property.

The deed also states that "[t]he Property shall be used by the [Owners] only for residential recreational purposes, and maintenance or access related to such purposes, together with conservation purposes and for the proper management of its forest resources." Further, the deed states that the Conservation Easement is intended to "prevent any non-residential use, non-recreational use or development which would conflict with [the land's] natural, scenic condition, except as provided" in the deed and that the Protected Parcel is intended to provide "a place of recreation and of natural solitude." The key issue for analysis is to determine whether the term "residential recreational purposes" encompasses the uses proposed by the Owners.

[¶ 26] We note at the outset that, despite the parties' attempts to define "residential" by contrasting it to "commercial," the word "commercial" does not appear in the Conservation Easement. We do not, therefore, attempt to define "commercial"

for purposes of interpreting "residential recreational purposes."

[¶ 27] The terms "residential recreational purposes" and "non-residential use" are not defined in the deed. The Owners urge us to apply a meaning of "residential" as that word is, they argue, typically used in land use law. We decline to do so. "In evaluating the language of a deed, courts should give effect to the common or everyday meanings of the words in the instrument." *N. Sebago Shores,* 2007 ME 81, ¶ 13, 926 A.2d at 733. We apply the common, everyday understanding of the word "residential," which is "of or relating to residence or residences." Webster's New Collegiate Dictionary 977 (1979). The definition of "residence" is understood to include:

> 1a: the act or fact of dwelling in a place for some time; b: the act or fact of living or regularly staying at or in some place for the discharge of a duty or the enjoyment of a benefit; 2a(1): the place where one actually lives as distinguished from his domicile or a place of temporary sojourn.

*Id.*

[¶ 28] The meaning of "residential recreational purposes," therefore, refers, unambiguously, to recreational activities associated with those who are regularly living at that locale. Thus, the deed's several references to "residential recreational purposes" indicate the parties' intent to restrict the use of the Protected Parcel to the residents of the front fifteen acres for their recreational purposes, and to preclude the income-producing or -generating uses proposed by the Owners. *See generally Green v. Lawrence,* 2005 ME 90, ¶ 8, 877 A.2d 1079, 1082 (holding that the term "wood lot" in a restrictive covenant is a common term and not ambiguous, requiring no extrinsic evidence to determine the parties' intent).

[¶ 29] The Owners' several arguments in favor of a contrary conclusion are not persuasive. First, the deed occasionally refers to "recreational use" (without the "residential" modifier) and to the Owners' right of "general enjoyment" on the Protected Parcel. However, when those terms are read in the context of the deed as a whole, it is evident that the parties intended the more specific term, "residential recreational purposes" to trump any more general terms. *See Kinney,* 403 A.2d at 349.

[¶ 30] Second, the Owners argue that the deed's reference to the legal duties of the Owner and the Trust with respect to "members of the general public" who may enter the Protected Parcel "for recreational purposes" can only refer to an intent to allow the Owners to "open the Protected [Parcel] to the general public for a fee." We disagree. This provision merely reiterates our statutory law limiting landowner liability for recreational uses, *see* 14 M.R.S. § 159–A(2) (2008), and acknowledges Maine's open lands tradition, allowing public access to wilderness lands for recreational use, *see Weeks v. Krysa,* 2008 ME 120, ¶ 15, 955 A.2d 234, 238 ("Maine has a tradition of acquiescence in access to nonposted fields and woodlands by abutters and by the public. Pursuant to our open lands tradition, recreational use of unposted open fields or woodlands and any ways through them are presumed permissive and do not diminish the rights of the owner in the land.") (internal citation omitted). This section of the deed does not undermine a conclusion that, as a matter of law, the deed prohibits the Owners from engaging in the types of activities they propose.

[¶ 31] Finally, the Owners assert that language in the easement deed allows them to offer tractor-pulled hay rides to

paying guests. The deed provides that the use of motorized vehicles, including, without limitation, motorcycles, snowmobiles, all terrain vehicles, and tractors, is prohibited on the Protected Parcel, except that the Owners "shall be allowed the use of motorized vehicles by [the Owner] and [the Owner's] guests, up to but not exceeding five in number at any one time." This language is ambiguous in that it is unclear whether the Owner is limited to allowing up to five motorized vehicles or five guests at any one time on the Protected Parcel. Any ambiguity in this respect does not, however, alter our analysis that the deed, read as a whole, precludes the Owners from using the Protected Parcel for activities by the paying public.

[¶ 32] We can, without resort to extrinsic evidence, derive from the deed's language the intent of the parties to limit use of the Protected Parcel to "residential recreational purposes" and to preclude the activities now proposed by the Owners.[5] The Conservation Easement may be an imperfectly drafted document. However, even if we were to conclude that the document was sufficiently ambiguous to require a court to look to extrinsic evidence to glean the parties' intent in drafting the deed, the Owners failed to demonstrate that such evidence exists. The only extrinsic evidence the Owners provided to the summary judgment court was an unauthenticated "letter to the editor" purportedly written by a Freeman family member. The Owners argue that this letter is evidence that the parties to the deed anticipated that the Protected Parcel would be used for horseback riding lessons by the paying public and, therefore, the deed does not prohibit use of the Protected Parcel for activities by the paying public. Contrary to the Owners' contentions, this let-

ter fails to demonstrate the existence of a genuine issue of material fact for four reasons.

[¶ 33] First, the letter was not put properly before the court. The Owners stated in their statement of additional facts that the letter, written by a family member in 2007, shows the intent of the Conservation Easement to allow the owners to use the protected property for horseback riding and horseback riding lessons. The Owners cite to Jeffords's affidavit as support for this factual statement. However, there is no indication that Jeffords had personal knowledge, as is required of an affiant, that the family member actually wrote such a letter or what the intent of the author was. *See Bahre v. Liberty Group, Inc.*, 2000 ME 75, ¶ 12, 750 A.2d 558, 561 (holding that an affidavit submitted in opposition to a motion for summary judgment must show affirmatively that it is based on the affiant's personal knowledge).

[¶ 34] Second, "[e]vidence set forth in an affidavit in opposition to a motion for a summary judgment must be admissible evidence." *Searles v. Trs. of St. Joseph's Coll.*, 1997 ME 128, ¶ 9 n. 2, 695 A.2d 1206, 1210. The letter referred to in Jeffords's affidavit would not have been admissible evidence. *See* M.R. Civ. P. 56(e) (requiring all copies of papers referred to in an affidavit to be sworn or certified); M.R. Evid. 802 (hearsay rule), 901 (authentication).

[¶ 35] Third, even if the letter were admissible, it provides no evidence that the parties to the deed actually agreed that the Protected Parcel could be used for income-generating horseback riding lessons, much less any other similar activities. The letter states that the cou-

5. Given our holding, it is unnecessary for us to consider the Owners' argument that their proposed activities would have no harmful impact on the Protected Parcel.

ple who purchased the Freeman Farm from the Freeman family "asked for language that would allow for horseback riding as well as possibly using the land for riding lessons." The letter states that, in response to that request, the Freeman family and the Trust "agreed upon slight changes in the wording of the easement before the sale was complete." The letter does *not* state that the family and the Trust acquiesced to the then-buyer's request to allow the Protected Parcel to be used for horseback riding lessons by the paying public, and in fact, the plain language of the deed as finally drafted evidences no such thing. The deed provides only that the Protected Parcel may be used to dispose of "horse manure or other animal waste generated from permitted activities on [the front fifteen-acre parcel] or [the Protected Parcel]." The plain language of the deed does not indicate that "permitted activities" relating to horses or other animals on the Protected Parcel would include fee-generating horseback riding lessons or any other fee-generating activity.

[¶ 36] Accordingly, the language of the deed is sufficiently clear for us to conclude that the intent of the parties to that document was to prohibit use of the Protected Parcel for the income-generating purposes proposed by the Owners and that the Owners failed to show the existence of a genuine issue of material fact in this regard.

2. Whether the court erred in granting the Trust and State's motion for summary judgment because material facts are in dispute.

[¶ 37] The Owners argue that the court erred in granting the Trust's summary judgment motion because the competing statements of material fact demonstrate the existence of a genuine issue of material fact and because an evidentiary hearing was required to determine whether the Trust should have been equitably estopped from pursuing its action.

[¶ 38] As to their equitable estoppel argument, the Owners contend that the court's grant of a summary judgment improperly prevented them from "establishing the key facts at trial" to equitably estop the Trust from pursuing its action. However, the doctrine of equitable estoppel "only applies when an individual makes misrepresentations, including misleading statements, conduct, or silence, that induce detrimental reliance." *Town of Freeport v. Ring*, 1999 ME 48, ¶ 14, 727 A.2d 901, 906 (quotation marks omitted). In this case, the Owners' additional material facts assert that the Trust's attorney told them more than a year after they purchased the Freeman Farm that he thought their proposed activities on the Protected Parcel would not violate the Conservation Easement and that the Owners relied on his statements in developing their "2007 financial plan." [6] Assuming for purposes of this discussion that this is true, the Owners have not shown any detrimental reliance given that they purchased the Freeman Farm long before the alleged conversation with the Trust's attorney; they purchased the land fully aware of the Conservation Easement; and they admit that, but for a few activities associated with charitable events held on the front fifteen-acre parcel, they have not gone forward with any of their proposed activities on the Protected Parcel.

---

6. The Owners also assert that they relied on the statements by the Trust's attorney when they cleared slash from the Protected Parcel to make it suitable for their proposed public activities. However, this is inconsistent with the assertion in their statement of additional facts that they began clearing the Protected Parcel "soon after their 2004 purchase."

[¶ 39] Because there are no genuine disputes of material fact, the court did not err in granting a summary judgment in favor of the Trust and the State.

## D. The Permanent Injunction

■ [¶ 40] The Owners argue that the Trust and State failed to show any of the elements required to acquire a permanent injunction and that, even if it affirms the summary judgment, this Court should vacate the permanent injunction issued by the court. We review the court's decision for an abuse of discretion. *Walsh v. Johnston*, 608 A.2d 776, 778 (Me.1992).

■ [¶ 41] The party seeking a permanent injunction, as with a preliminary injunction, must show that: (1) the party would suffer irreparable injury if the injunction is not granted; (2) such injury outweighs any harm that granting injunctive relief would inflict on the party opposing the injunction; (3) the public interest will not be adversely affected by granting the injunction; and (4) the plaintiff succeeds on the merits. *Id.*; *Fitzpatrick v. Town of Falmouth*, 2005 ME 97, ¶ 18, 879 A.2d 21, 27. A court does not consider these elements in isolation, but weighs all the criteria together in determining whether injunctive relief is proper in the specific circumstances of the case. *Walsh*, 608 A.2d at 778.

■ [¶ 42] "[F]act-finding that is a prerequisite for judicial action, such as a finding of irreparable injury, or lack thereof, is reviewed for clear error," *Bangor Historic Track, Inc. v. Dep't of Agric.*, 2003 ME 140, ¶ 11, 837 A.2d 129, 133, whereas conclusions of law are reviewed de novo, *see Fitzpatrick*, 2005 ME 97, ¶ 19, 879 A.2d at 27. In this case, the permanent injunction court did not make factual findings concerning the four elements described above, nor did the Owners request additional findings. In such an instance,

we assume the court made all necessary findings "that could be gleaned" from the evidence. *See Associated Builders, Inc. v. Oczkowski*, 2002 ME 115, ¶ 11, 801 A.2d 1008, 1011. We conclude the court did not abuse its discretion in issuing the permanent injunction.

The entry is:

Judgment affirmed.