STATE OF MAINE
CUMBERLAND, ss.

BUSINESS AND CONSUMER COURT
CIVIL ACTION
DOCKET NO. BCD-REA-2023-00007

MONTAGU REID HANKIN and
BONDIE HANKIN,

     Plaintiffs,

v.

SARAH B. SEWALL and
THOMAS P. CONROY,

     Defendants,

   And

GUN CLUB, INC., et al.

     Parties-in-Interest.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

ORDER GRANTING PLAINTIFFS'
MOTION FOR TEMPORARY
RESTRAINING ORDER AND
PRELIMINARY INJUNCTION

## BACKGROUND

Before the court is a Motion for Temporary Restraining Order and Preliminary Injunction filed by Montagu Reid Hankin and Bondie Hankin (together, the "Plaintiffs") in the above-captioned matter. Plaintiffs, through their motion, request this court enter a temporary restraining order against Defendants Sarah B. Sewall and Thomas P. Conroy (together, the "Defendants") enjoining them from interfering with, impeding, blocking, gating, interrupting, or threatening, in any way, Plaintiffs' use, passage, and easement rights over and across Navy Road in the Town of Phippsburg, State of Maine.

## FACTUAL ALLEGATIONS

The court recites the factual allegations from Plaintiffs' Verified Complaint for the purpose of deciding Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction.

## I. Location of Navy Road

The parties' properties are within the area of land depicted in and described by a certain Plan of Lots by Morton & Quimby, dated January 1, 1896. (V. Compl. ¶ 90.) That plan also shows proposed roads and lots in connection with future development of the depicted land, which necessarily includes Navy Road. (V. Compl. ¶ 91.)

Until the early 1960s, Navy Road existed as a cart path between Seal Cove Road and Small Point in Phippsburg. (V. Compl. ¶¶ 91-92.) During the 1960s, the United States Government developed Navy Road as a means to access the Rake Station located at the south end of Small Point. (V. Compl. ¶ 93.) To do so, the government acquired easements from various landowners of properties along Navy Road between the Seal Cove Road junction and Small Point. (V. Comp. ¶ 93.) A governmental survey shows that Navy Road was constructed, in part, over existing cart paths and other roads, and that it crosses areas shown as roads proposed for future development in the Morton & Quimby Plan.[1] (V. Compl. ¶ 93.)

According to the Defendants, they are the owners of part of the eastern half of Navy Road, which is within their lot. (*See* Defs.' Opp'n Pls.' Mot. for TRO, 1.)

## II. Use of Navy Road to Access Plaintiffs' Property

Plaintiffs reside at the property located at 116 Navy Road in Phippsburg, Maine, which they acquired by deed dated March 25, 2021 (the "Hankin Property"). (V. Compl. ¶¶ 1, 15.) Defendants, who reside in Natick, Massachusetts, own the real property located at 44 Navy Road

---

[1] The governmental survey is entitled "U.S. Naval Air Station, Brunswick Maine Boundary and Easement Plan Proposed Rake Sta. No. 2 and Access Road, Phippsburg, Maine," dated December 14, 1969, and recorded with the Sagadahoc County Registry of Deeds. (V. Compl. ¶ 93.)

as trustees of the Sarah B. Sewall Revocable Trust and the Thomas P. Conroy Revocable Trust, which they acquired by deed dated December 18, 2021.[2] (V. Compl. ¶¶ 2, 156.) The owners of the other properties abutting Navy Road are named parties-in-interest in this lawsuit. (V. Compl. ¶¶ 3-14, 18-30.)

The Hankin Property was previously owned by Plaintiff Montagu Reid Hankin's grandmother, Marcia H. Gallup, during the 1950s, and then passed to his mother, Marcia Gallup Hankin, during the early 1970s. (V. Compl. ¶ 33.) During 1976, Marcia Gallup Hankin retained a builder to construct a home there, which was constructed consistent with municipal approvals and according to a septic easement from Party-in-Interest Gun Club, Inc. (V. Compl. ¶¶ 35, 38.) The home was built with insulation and heat for year-round usage. (V. Compl. ¶ 36.) Since that time, under Plaintiffs' family's ownership the Hankin Property and home were and continue to be continuously occupied by Plaintiffs' immediate family, during both summer and winter months. (V. Compl. ¶¶ 39-41, 46.)

Between 1976 and 2010, Plaintiffs, their friends and family utilized the Hankin Property from time to time each year and accessed it from Navy Road. (V. Compl. ¶¶ 42, 99.) Because many of these visits occurred during wintertime, Plaintiffs have paid for plowing of Navy Road. (V. Comp. ¶¶ 41, 96.) Plaintiffs, their friends and family accessed the Hankin Property by car across Navy Road during this period, without objection by or permission from Defendants or any other party.[3] (V. Compl. ¶¶ 34, 37, 42, 82.) Likewise, contractors driving construction trucks and other service providers utilized Navy Road to service, repair or maintain the Hankin Property. (V. Compl. ¶ 43.)

---

[2] Beforehand, Sewall and Conroy owned their Small Point property in their induvial capacities.
[3] The Hankin Property was accessed almost exclusively by car, except for occasions when Plaintiffs hiked in. (V. Compl. ¶ 96.)

Marcia Gallup Hankin deceased during 2010. (V. Compl. ¶ 42.) Plaintiffs held title to the Hankin Property between 2010 and 2020 through their limited liability company owned by Plaintiff Reid Hankin and his siblings. (V. Compl. ¶ 44.) They continued their use of Navy Road to access the Hankin Property during this period. (V. Compl. ¶ 44.) During 2020 or 2021, Plaintiffs acquired the siblings' interest in the Hankin Property and became the sole, individual owners thereof. (V. Compl. ¶ 45.) Then, they moved to Maine from New York and began to live at the Hankin Property full time. (V. Compl. ¶ 46.) Due to their use of Navy Road, Plaintiffs have made numerous contributions to its maintenance, including plowing and making repairs after a large storm. (V. Compl. ¶¶ 96, 98.) Defendants also contributed to such repairs. (V. Compl. ¶ 98.)

On or about January 23, 2021, Plaintiffs received a letter from Defendants that, for the first time, called into question Plaintiffs' and their predecessors-in-titles' right to use Navy Road. (V. Compl. ¶¶ 57, 109.) Until then, Defendants had affirmed others' use of Navy Road, including Plaintiffs'. (V. Comp. ¶ 103.) Through the letter, Defendants notified Plaintiffs that they would not have year-round access over Navy Road, and that they should seek alternative access to the Hankin Property via Gun Club Road. (V. Compl. ¶ 58.) The Hankin Property has never been accessible from Gun Club Road; the intervening area is thickly vegetated and steep, and it contains ledge. (V. Compl. ¶¶ 59-60, 99, 109.)

In response to Defendants' letter, Plaintiffs and other members of the Small Point community notified Defendants that Plaintiffs have lawful access over Navy Road and that said access is necessary to reach the Hankin Property. (V. Compl. ¶ 61.) Nonetheless, Defendants proceeded to install a gate across Navy Road to the south of Defendants' driveway and north of Plaintiffs'. (V. Compl. ¶ 62.) Defendants threatened to lock the gate and to refuse southbound

4

vehicular passage on Navy Road below the gate as of October 15, 2022. (V. Compl. ¶ 62.) The gate is installed such that it only blocks vehicular access to the properties located to the south of Defendants' property, which includes the Hankin Property. (V. Compl. ¶¶ 63, 75-76.)

When the gate was installed during October of 2021, Defendants locked it and provided Plaintiffs with a key. (V. Compl. ¶ 65.) The gate remained locked throughout the winter of 2021 and 2022, which required the Plaintiffs to exit their vehicle, unlock and open the gate, drive through it, then exit their vehicle again to close and lock the gate before accessing their property. (V. Compl. ¶ 66.) Each Plaintiff fell on at least one occasion when they were working the gate. (V. Compl. ¶ 67.) Plaintiffs were required to leave their home to open and close the gate each time their guests or service providers arrived and departed, and each time their snow contractor arrived to plow Navy Road. (V. Compl. ¶¶ 69-71, 80.)

When Plaintiffs left the gate unlocked to ensure that it would not freeze, Defendants complained and, through counsel, told Plaintiffs that they must lock the gate at all times or else Defendants would permanently lock it. (V. Compl. ¶¶ 72-73.) Plaintiffs, hopeful to keep the neighborhood peace, complied. (V. Compl. ¶ 74.) However, Plaintiffs complain that Defendants located the gate where it is intentionally to hassle and inconvenience Plaintiffs. (V. Compl. ¶ 76.)

Defendants also blocked Navy Road during the summer months by closing the gate, drawing a rope from the gate across the ungated portion of Navy Road, and by parking their car in front of the gate. (V. Compl. ¶ 78.) This prevented or delayed certain of Plaintiffs' contractors from accessing the Hankin Property, performing work there, and from departing from the Hankin Property. (V. Compl. ¶¶ 78, 80.) During the summer of 2022, Defendants asked to

5

meet with Plaintiffs and then informed them that Plaintiffs must relocate their driveway because they planned to lock the gate on October 15 that year. (V. Compl. ¶¶ 81, 83.)

If Defendants maintain the locked gate across Navy Road, it will render the Hankin Property and Plaintiffs' home there inaccessible by vehicle. (V. Compl. ¶¶ 84, 99.) Emergency personnel and Plaintiffs' service providers will not be able to access the Hankin Property. (V. Compl. ¶¶ 84-85.) Plaintiffs and other owners of the properties along Navy Road have declared their rights to use Navy Road to access their properties. (V. Compl. ¶ 86.)

## TEMPORARY RESTRAINING ORDER STANDARD

The party seeking a temporary restraining order ("TRO") must demonstrate that the following elements are satisfied: (1) the movant will suffer irreparable injury if the TRO is not granted; (2) such injury outweighs any harm which granting the TRO would inflict on the adverse party; (3) the movant has a likelihood of success on the merits; and (4) the public interest will not be adversely affected by granting the TRO. *Bangor Historic Track, Inc. v. Dep't of Agric., Food & Rural Res.*, 2003 ME 140, ¶ 9, 837 A.2d 129 (citation omitted); *see also* M.R. Civ. P. 65(a).

Each of these four elements must be established by a preponderance of the evidence. *See Cumberland Farms, Inc. v. Everett*, 600 A.2d 398, 399 (Me. 1991). "A court does not consider these elements in isolation, but weighs all the criteria together in determining whether injunctive relief is proper in the specific circumstances of the case." *Windham Land Tr. v. Jeffords*, 2009 ME 29, ¶ 41, 967 A.2d 690 (discussing injunctive relief generally) (citation omitted). Nonetheless, a moving party's failure to demonstrate any of the four elements or criteria requires denial of the requested TRO. *Bangor Historic Track, Inc.*, 2003 ME 140, ¶ 10, 837 A.2d 129 (citation omitted).

6

## DISCUSSION

Plaintiffs' Verified Complaint includes counts for declaratory, equitable, and injunctive relief primarily relating to their claimed right to access the Hankin Property by and over Navy Road.[4] (V. Compl. ¶¶ 115-130, 163-172.) Plaintiffs base this claim on an alleged express easement (Count III), easement by prescription (Count IV), easement by estoppel (Count V), or easement by necessity (Count VI). (V. Compl. ¶¶ 131-146.) Because the court finds the present record is sufficient to grant Plaintiffs' motion insofar as it seeks temporary injunctive relief related to the claimed easement by prescription, the court's discussion is limited to Plaintiffs' Count IV.

### I.     Whether Plaintiffs will suffer irreparable injury if the TRO is not granted.

A TRO may be granted only if specific facts alleged by affidavit or in a verified complaint clearly show that "immediate and irreparable injury, loss, or damage will result" to the moving party without such an order. *Bangor Historic Track, Inc.*, 2003 ME 140, ¶ 10, 837 A.2d 129 (citing M.R. Civ. P. 56(a)). "Irreparable injury" is defined as "injury for which there is no adequate remedy at law." *Id.* (citations omitted). Wrongful and persistent interference with another's legitimate and material right to access their property constitutes an irreparable injury. *See Stanton v. Strong*, 2012 ME 48, ¶ 11, 40 A.3d 1013. This is because "the owner of an estate that is servient to an easement may not make a use of the servient land which impairs effective use of the easement within the bounds of the easement." *Id.* ¶ 10 (quoting *Badger v. Hill*, 404 A.2d 222, 227 (Me. 1979)).

Plaintiffs satisfied their burden of proof concerning their irreparable injury. Unless Defendants are enjoined from maintaining the locked gate across Navy Road, Plaintiffs, their

---

[4] Plaintiffs also assert claims under theories of boundary by acquiescence (Count VII) and nuisance (Count VIII). (V. Compl. ¶¶ 147-162.)

7

guests and service providers will not be able to freely access the Hankin Property and Plaintiffs' home. Plaintiffs cannot access the Hankin Property via any other route, such as Gun Club Road. Construction of a way from the Hankin Property to Gun Club Road is not feasible. Thus, Plaintiffs' injury, Defendants' alleged persistent interference with Plaintiffs' right to access their property, is not readily reduced to damages. This factor favors granting Plaintiffs' requested TRO.

**II.     Whether Plaintiffs' claimed injury outweighs any harm that granting the TRO would inflict upon Defendants.**

Plaintiffs alleged injury is described above. In opposition to Plaintiffs' motion, Defendants claim that maintenance of the locked gate across Navy Road is necessary to protect their privacy and to prevent damage to Navy Road. The current record does not make clear whether these are actual issues, or merely speculative concerns. Accordingly, Plaintiffs' claimed inability to freely access their property that would result without a TRO outweighs these harms. This factor also favors Plaintiffs.

**III.     Whether Plaintiffs' prescriptive easement claim is likely to succeed on the merits.**

The party claiming a prescriptive easement must prove the following elements by a preponderance of the evidence: (1) continuous use for at least twenty years, (2) under a claim of right adverse to the owner, (3) with the owner's knowledge and acquiescence, or with a use so open, notorious, visible, and uninterrupted that knowledge and acquiescence will be presumed. *Androkites v. White*, 2010 ME 133, ¶ 14, 10 A.3d 677; *see also* 14 M.R.S. § 812. The court finds that, on the record evidence, Plaintiffs are likely to succeed on the merits on each element of their prescriptive easement claim.

        **a.     Plaintiffs' continuous use of Navy Road to access the Hankin Property throughout the statutory period.**

8

The present record suggests it is more likely than not that the Plaintiffs' use of Navy Road to access the Hankin Property and their home there was sufficiently continuous throughout the statutory period to entitle them to a prescriptive easement. First, Plaintiffs and their predecessors-in-title used Navy Road to access the Hankin Property since 1976, more than the twenty-year statutory period. Next, the nature of Plaintiffs' use of Navy Road was consistent, even if intermittent, during the many years when they maintained their primary residence outside of Maine.

Defendants argue that intermittent, seasonal use is not sufficiently continuous or of a nature to support a prescriptive easement. (Def.'s Opp'n to Pls.' Mot. for TRO, 14-15.) It is true that "[t]he extent of an easement created by prescription is fixed by the use through which it was created." *Bray v. Grindle*, 2022 ME 130, ¶ 14, 802 A.2d 1004 (quoting Restatement of Property § 477 (Am. Law Inst. 1944)). However, "some variation between the use by which a prescriptive easement was created and the uses made under it after its creation is inevitable. The problem is to ascertain the limits of permissible variation." *Id.* ¶ 15 (quoting Restatement of Property § 478, cmt. a). To determine whether a given variation between the use under which a prescriptive easement was generated and a particular use, court's compare (1) the physical character of each use, (2) their purpose, and (3) the relative burden caused by them upon the servient estate. *Id.* ¶ 15 (citation omitted).

Here, the prescriptive easement was generated by Plaintiffs' family's, guests', and service providers' intermittent use of Navy Road to access the Hankin Property and Plaintiffs' home there. Plaintiffs' present use is for the same general purpose. There is no material difference in the physical character or purpose across these uses; each goes to vehicular and pedestrian passage across Navy Road to access the Hankin Property. Finally, there is no significant

9

variation in the relative burden on Defendants or on Navy Road. Mere increase in the volume or frequency of traffic is insufficient to establish *per se* a greater independent burden on the servient estate. *See Great Northern Paper Co., Inc. v. Eldredge*, 686 A.2d 1075, 1079 (Me. 1996). Otherwise, there is little, if any, record evidence available to corroborate Defendants' allegation that Plaintiffs' present use of Navy Road is overly burdensome. *See generally Wakelin v. Marietta*, No. CV-21-019, 2021 Me. Super. LEXIS 126, at *4 (Me. Super. Ct. June 1, 2021).

### b. Plaintiffs' use of Navy Road under a claim of right adverse to Defendants.

"To use a property under a claim of right, a claimant must be in possession as the owner, intending to claim the land as his own, and may not be in recognition of or subordination to the record title owner." *Jordan v. Shea*, 2002 ME 36, ¶ 23, 791 A.2d 116. Additionally, the claimant's use of the property at issue is "adverse" when they "disregard the owner's rights entirely and use[] the land as though he were the true owner. Relevant to these determinations is the claimant's state of mind." *Id.* (citations and internal quotation marks omitted). Hence, it is fatal to a prescriptive easement claim that the claimant seeks the owner's permission to use the subject property, or that the owner affirmatively permits the claimant's use thereof. *Id.* ¶ 24. Otherwise, courts may presume a claimant's use is adverse to the owner's rights when it is continuous for the statutory period and the owner acquiesces to that use. *Lincoln v. Burbank*, 2016 ME 138, ¶ 31, 147 A.36 1165.

Here, Plaintiffs believe that they are entitled to rightful use of Navy Road. They allege that neither of the Defendants ever objected to or permitted Plaintiffs' or their predecessors-in-titles' use of Navy Road until 2021. Defendants refute this claim and assert that (1) Plaintiffs had permission to use Navy Road through a mutual understanding observed by the neighborhood; (2) the "blood relative exception," *see Lincoln*, 2016 ME 138, ¶ 31, 147 A.36 1165, should apply to defeat any presumption that Plaintiffs' use of Navy Road was adverse to

10

Defendants; (3) Plaintiffs' use of Navy Road was not adverse to Defendants until 2009, when Plaintiffs began to use Navy Road independent of the United States government; and (4) Defendants had their land posted pursuant to 14 M.R.S. § 812 (2018), during 2018. (Def.'s Opp'n to Pls.' Mot. for TRO, 15-16.)

First, apart from Defendants' allegations, there is no record evidence of mutual understanding among Plaintiffs and the other members of the Small Point neighborhood that Plaintiffs use Navy Road with Defendants' permission. Plaintiffs, on the other hand, submitted affidavits by parties-in-interest evincing how their and others' Small Point properties were always necessarily accessed over Navy Road, and that they accessed them accordingly as a matter of right. (*See* Pls.' Mot. for TRO, Exs. D, E.)

Next, the parties are related by blood merely in that they share a great, great, great grandfather. (Defs.' Opp'n to Pls.' Mot. for TRO, 15 n.37.) In Maine, evidence of a familial relationship between the dominant and servient estates may preclude application of any presumption of adverse use. *Lincoln*, 2016 ME 138, ¶ 31, 147 A.3d 1165. However, the exception may apply only to cases wherein those estates "were owned within the same family during the period in which the prescriptive right of access is alleged to have accrued." *Androkites*, 2010 ME 133, ¶ 18, 10 A.3d 677. That is not the case here. Thus, Plaintiffs, absent record evidence of any permission from or other affirmative non-acquiescence by Defendants, are entitled to a presumption that their use of Navy Road during the statutory period was "adverse" to Defendants.

Finally, neither the nature and timing of the Navy's use of Navy Road nor the fact that Defendants posted their land during 2018 defeat Plaintiffs' claim of adversity at this stage. The Navy used and developed Navy Road under its own express easements. The Navy's use of Navy

11

Road does not dictate whether Plaintiffs' use was adverse to Defendants. An existing easement to use of real property in a third party is not an obstacle to generation of a new easement by prescription. Further, Plaintiffs' claimed easement by prescription ripened after twenty years. On the TRO record, the court measures twenty years from 1976 or shortly thereafter, which elapsed before 2018. Thus, Defendants did not defeat Plaintiffs' claim when they posted their property during 2018.

### c. Defendants' knowledge of Plaintiffs' use of Navy Road.

The record evidence is sufficient to establish that Defendants knew about Plaintiffs' and others' use of Navy Road. The individual Plaintiffs and their family members began to use the Hankin Property as early as 1976. Beginning that year, Defendants reasonably should have observed Plaintiffs and Plaintiffs', their guests, contractors and service providers intermittently accessing the Hankin Property from Navy Road. Also, Plaintiffs, like Defendants, contributed to and coordinated the maintenance of Navy Road. Even if Defendants were truly unaware of Plaintiffs' use of Navy Road (which is unlikely, in consideration of the shared maintenance and Defendants' posted notice), Plaintiffs above-described use of Navy Road was sufficiently "open, notorious, visible, and uninterrupted" to entitle them to a presumption regarding Defendants' knowledge of and acquiescence to it.

Thus, under the current record, Plaintiffs are substantially likely to succeed on the merits of their prescriptive easement claim.

### IV. Whether public policy would be adversely affected by granting the injunction.

Other than a fundamental policy interest in ensuring landowners access to their real property, the court concludes that public policy is not meaningfully implicated under the circumstances. This factor favors Plaintiffs, but in this case it is less significant and less weighty than the other factors.

12

## V. Plaintiffs' entitlement to a TRO; duration and scope.

In conclusion, the court grants Plaintiffs the requested TRO. Consistent herewith:

1. Defendants must unlock and open the gate installed immediately to the south of their property along Navy Road, and immediately to the north of the Hankin Property;

2. Defendants must keep the gate unlocked and open for the duration of this court's order;

3. Defendants are otherwise enjoined from taking any action that results in obstructing or blocking, for any amount of time, free passage across Navy Road between the Seal Cove Road junction and Small Point in Phippsburg, Maine;

4. This court's Order Granting Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction will expire when this case is resolved by final judgment.

Because the issue of security was not addressed by either party in the papers or during the parties' status conference with the court on May 16, 2023, the court has no basis to determine a proper sum for the payment of "such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined." M.R. Civ. P. 65(c).

## CONCLUSION

Based on the foregoing, the entry will be: Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction is GRANTED.

So ordered.

The Clerk is requested to enter this Order on the Docket, incorporating it by reference pursuant to Maine Rule of Civil Procedure 79(a).

Date: 6/5/23

Thomas R. McKeon
Justice, Business & Consumer Court

Entered on the docket: 06/05/2023

13